[No. B176953. Second Dist., Div. Five. Jan. 10, 2006.]

KEN COLGAN et al., Plaintiffs and Respondents, v.
LEATHERMAN TOOL GROUP, INC., Defendant and Appellant.

668

**COUNSEL**

Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk; Jr., Barbara A. Winters, Robert T. Cruzen; Jones, Bell, Abbott, Fleming & Fitzgerald, Michael J. Abbott, Fredrick A. Rafeedie and William M. Turner for Defendant and Appellant.

The Rossbacher Firm, Henry H. Rossbacher, James S. Cahill, Talin Khachaturian; Cuneo, Waldman & Gilbert, Jon A. Tostrud; Blecher & Collins and Maxwell M. Blecher for Plaintiffs and Respondents.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Albert Norman Shelden, Assistant Attorney General, Ronald A. Reiter and Benjamin G. Diehl, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

MOSK, J.—Defendant and appellant Leatherman Tool Group, Inc. (Leatherman) appeals from the trial court's summary adjudication of Leatherman's liability under the false advertising law (Bus. & Prof. Code, §§ 17500, 17533.7),[1] the unfair competition law (§ 17200 et seq.), and the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.) as the result of Leatherman's labeling and advertising its products as "Made in U.S.A.," when parts of those products were manufactured outside the United States. Leatherman also appeals from the judgment of restitution, the mandatory injunction, and the amount of the attorney fees awarded to plaintiffs.

We affirm the summary adjudication that Leatherman violated the false advertising law and the CLRA because, as a matter of law, there was sufficient manufacturing of components abroad so as to make Leatherman's representations that its products were made in the United States deceptive. The evidence presented was sufficient, without further extrinsic evidence—such as a consumer survey—to establish that Leatherman's representations were deceptive. We also affirm the summary adjudication that Leatherman violated section 17533.7, and therefore the unfair competition law, by selling products represented as "Made in U.S.A." "when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." (§ 17533.7.) That a product may have been designed, processed and assembled in the United States does not preclude the conclusion that a "part" of the product was "substantially made, manufactured or produced" outside the United States. As a matter of law, Leatherman's products were substantially made outside the United States.

We reverse the restitution award because the trial court had no evidence to support its computation of the amount of restitution awarded. Whether or not restitution is an equitable remedy, that remedy still requires substantial evidence to support it. We affirm the statutory penalty of $1,000 under the CLRA. We affirm the injunctive relief, including the mandatory injunction,

---

[1] All further statutory references are to the Business and Professions Code, unless otherwise stated.

except to the extent the injunctive relief concerns matters related to restitution. We remand the matter to the trial court to eliminate the restitution award, modify the injunction to take into account that there is no need to give notice for the purpose of restitution, and modify the attorney fees award to reflect the absence of any restitution award.

## I. BACKGROUND

### A. *The Parties and the Products*

Plaintiffs are representative members of a class of persons in California who purchased Leatherman tools during the class period. Leatherman is a privately held corporation based in Portland, Oregon that manufactures hand-held, multicomponent, multifunction tools comprised of components such as screwdrivers, pliers, saws, files, corkscrews, clip plates, locking T's, and bit holders.[2]

Leatherman offered for sale and sold 22 tool products in California during the class period and represented on the tool products, on packaging, and in advertising that the tools were made in the United States. Significant working parts of the tools were investment cast,[3] fineblanked,[4] formed, hardened, cut, forged, polished or machined in various foreign countries. The plier jaws that were investment cast in Mexico had the letters "USA" stamped onto the jaws themselves.

### B. *The Lawsuits and Leatherman's Response*

In April 2001 and July 2001, plaintiffs filed actions against Leatherman for violations of the false advertising law, unfair competition law, and the CLRA. Plaintiffs sought injunctive and equitable relief, including restitution, damages, punitive damages, attorney fees, and costs. The actions were consolidated on November 22, 2002, and class certification was granted on February 4, 2003. The class, as certified by the trial court, consists of two subclasses: the CLRA subclass, comprised of individuals who purchased in California from April 2, 1997 to the time of trial, Leatherman tools packaged, advertised or marked as "Made in U.S.A." or "U.S.A." for personal, family or household purposes; and the unfair competition law subclass, comprised of persons who

---

[2] The appendix contains illustrations of some of the tools at issue.

[3] Investment casting, also known as lost wax casting, involves shaping molten metal in a wax-formed mold. (See <http://www.efunda.com/processes/metal_processing/invest_casting.cfm> [as of Jan. 10, 2006].)

[4] Fineblanking is a metal stamping process. (Kren, *Fineblanking Facts* (Feb. 2002) Metalforming Magazine, at p. 83.)

purchased in California from April 2, 1997 to the time of trial, Leatherman tools packaged, advertised or marked as "Made in U.S.A." or "U.S.A."[5] Both subclasses alleged violations of the false advertising law.

After plaintiffs' lawsuits were filed, Leatherman's management decided to change the representations on Leatherman's tools and packaging. In July 2001, Leatherman's chief executive officer sent an e-mail to employees informing them of management's decision to implement these changes "as soon as reasonably possible in view of the required tooling changes and sell-through of existing inventory." Leatherman stopped stamping the letters "USA" on the plier jaws used in certain of its tools. In September 2001, Leatherman changed the representations on its product packaging to state "Made in U.S.A. of U.S. and foreign components." Leatherman did not, however, make any efforts to retrieve from retailers any of its products that contained unqualified "Made in U.S.A." representations. Leatherman continued to advertise its products with unqualified "Made in U.S.A." representations throughout the trial.

## C. Summary Adjudication and Trial

The parties filed cross-motions for summary adjudication on the issue of Leatherman's liability under the false advertising law, unfair competition law, and the CLRA. The trial court denied Leatherman's motion and granted plaintiffs' motions for summary adjudication, ruling that Leatherman had violated the false advertising law and the unfair competition law and that Leatherman had no defense to the claim for violation of the CLRA.

The case proceeded to a court trial on the remedies. The parties presented oral testimony, including expert testimony; documentary evidence; and Leatherman tools, packaging, and advertising.

Based on evidence of Leatherman's prices and revenue, individual plaintiffs and the CLRA subclass argued that they were entitled to actual damages, measured by the difference between the retail price of the Leatherman tools and the retail price of other, allegedly similar Chinese-made tools sold in California. The individual plaintiffs and the unfair competition law subclass also requested restitution and offered two different formulas for calculating the amount of restitution. One formula was based on the retail purchase prices paid for the 22 allegedly misrepresented Leatherman tools up to an amount equal to Leatherman's total California sales revenues for those tools. The other formula was based on Leatherman's gross profits on the misrepresented products. There was no evidence quantifying the sums received by

---

[5] References to plaintiffs include both subclasses.

Leatherman attributable to the "Made in U.S.A." representations. Plaintiffs sought injunctive relief in the form of a prohibitory injunction preventing further sale and distribution in California of tools that were misleadingly designated or advertised as "Made in U.S.A." and a mandatory injunction informing California residents about the misleading packaging and advertising.

### 1. *Damages*

At the conclusion of the trial, the trial court found that as a result of Leatherman's deceptive business practices, plaintiffs suffered actual damages.[6] To determine the amount of actual damages for a CLRA award,[7] the trial court applied a market approach as set forth in Civil Code Section 3343, subdivision (a), which provides in part: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction . . . ." The term "actual value" as used in Civil Code section 3343 means market value. (*Nece v. Bennett* (1963) 212 Cal.App.2d 494, 497 [28 Cal.Rptr. 117].)

The trial court ultimately concluded that plaintiffs failed to meet their burden of proof in determining the amount of damages to be awarded under the CLRA. The trial court found the sample of retail prices for the Chinese-made tools provided by plaintiffs to be statistically unreliable and inappropriate. The trial court also found that there was no evidence of retail prices for either the Leatherman tools or the foreign-made tools during the years 1997–2002—the class period; the prices for many of the foreign-made and Leatherman tools had been heavily discounted; the foreign-made tools offered by plaintiffs for measuring actual damages were not comparable to the Leatherman tools; and there was no evidence that multipurpose, foreign-made tools had been sold by other companies in California between 1997 and 2002. Furthermore, the trial court found that evidence presented by Leatherman underestimated the quantity of its tools sold in California.

---

[6] Plaintiffs initially sought punitive damages against Leatherman as well, but elected not to pursue that claim at trial.

[7] Damages are not awardable under either the false advertising law or the unfair competition law. (*Chern v. Bank of America* (1976) 15 Cal.3d 866, 875 [127 Cal.Rptr. 110, 544 P.2d 1310] [false advertising law]; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1150 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*) [unfair competition law]; see *State v. Altus Finance* (2005) 36 Cal.4th 1284, 1304 [32 Cal.Rptr.3d 498, 116 P.3d 1175]; *Kraus v. Trinity Management Service, Inc.* (2000) 23 Cal.4th 116, 137 [96 Cal.Rptr.2d 485, 999 P.2d 718]; *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173 [96 Cal.Rptr.2d 518, 999 P.2d 706] (*Cortez*).)

Because it was unable to determine the amount of actual damages, the trial court awarded $1,000, the statutory minimum, for a violation of the CLRA prescribed by Civil Code section 1780, subdivision (a)(1).[8] The trial court stated: "If this Court were able to determine actual damages, this Court would have awarded more than $1,000. How much more, the Court does not know."

## 2. *Restitution*

The trial court awarded plaintiffs $13,012,255.50 in total restitution under the false advertising law, the unfair competition law, and the CLRA.[9] The trial court stated that it did "not attempt to trace exact monies paid by Class members for the purchase of the tools" but instead balanced the equities of the case, noting that Leatherman's tools "are of good to excellent quality and perform very well as advertised";[10] despite Leatherman's representations that its tools were made in the United States, the "significant," "functioning parts" of the tools were substantially made elsewhere; Leatherman made no meaningful changes in its advertising after the filing of this lawsuit; and Leatherman tools labeled as "Made in U.S.A." continued to be sold in 2002 and 2003. The trial court concluded that significant restitution to the class members was warranted.

In determining the amount of the restitution award, the trial court expressly rejected the market value approach proposed by plaintiffs by stating, "[f]or the same reasons that this Court would not accept Plaintiffs' proposed damage calculations as 'actual damages' under Civ. Code Section 1770, this Court declines to find as a reasonable restitutionary amount either the retail cost of the tools or the gross profits earned on the 22 misrepresented tools sold in California during the class period . . . ." The trial court further stated that it would be "inequitable" to return to consumers the entire purchase price paid for the tools or the entire gross profit Leatherman received from the tools

---

[8] Civil Code section 1780, subdivision (a)(1) provides as follows: "(a) Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following: [¶] (1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000)."

[9] The trial court awarded $13,012,255.50 in restitution for the false advertising law and unfair competition law claims and $11,709,667.50 in restitution for the CLRA claim, but made clear that the awards were not to be cumulative or to be paid separately, and that the maximum restitution to be paid for all claims was $13,012,255.50. The different periods of the applicable statutes of limitations account for the difference in the two awards. (Bus. & Prof. Code, § 17208; Code of Civ. Proc., 338, subd. (a); Civ. Code, § 1783.)

[10] Leatherman asked that we take judicial notice of various newspaper articles concerning its tools "in support of the factual proposition that Leatherman tools have gained acclaim for their quality and utility." We deny that request. Plaintiffs do not challenge the trial court's finding as to the quality of the Leatherman tools.

because, "although the purchasers did not receive entirely what they bargained for, which was a tool made in the USA, Plaintiffs and these Class members did benefit from the quality, usefulness, and safety of these multi-purpose tools."

The trial court established the restitutionary award as follows: "[T]his Court chooses the figure of 25 percent of the average wholesale unit price per tool per year times the number of units sold per year in California . . . for the years 1997 through April 2002." In determining the total amount, the trial court used the unit wholesale prices and unit sales information provided by Leatherman itself, thereby avoiding the difficulties the court had encountered when attempting to determine the average retail price per tool on an annual basis. The trial court stated that it chose 25 percent of gross receipts "as a reasonable amount, representing the appropriate restitution for the failure of the Class members to receive the full measure of the product the consumer believed he or she was receiving at the time of purchase." The trial court further stated, "Neither the restitutionary award nor the injunctive relief awards are meant as punishment; they are meant strictly as restitution and to prevent the citizens and residents of California from being misled in the future . . . ."

### 3. *Injunctive Relief*

The trial court granted both mandatory and prohibitory injunctive relief under the false advertising law, the unfair competition law, and the CLRA. The prohibitory injunction enjoined Leatherman from causing to be disseminated "any representation that Leatherman's multi-purpose tools or any article, unit or part are American made, made in USA, or statements to that effect if any multi-purpose tools or any article, unit or part thereof has been entirely or substantially made, manufactured or produced outside of the United States."

The mandatory injunction required Leatherman to take the following actions: to disseminate on its Web site for a period of six months and in newspapers circulated throughout California for a period of 12 consecutive weeks "a corrective announcement disclosing that the 22 Leatherman hand-held multi-purpose tools at issue sold in California were not made in the USA, but were made with parts utilizing foreign manufacture, labor and processing . . ."; to notify, within 30 days, all retailers, Internet sellers, wholesalers and government entities who sell Leatherman hand-held multi-purpose tools in California that the 22 tools at issue are not made entirely in the United States, but were made with parts utilizing foreign manufacture, labor or processing; to instruct all retailers, Internet sellers, wholesalers and government entities who sell Leatherman hand-held multipurpose tools in California (1) to stop representing to California residents in their respective

stores, or on their Web sites, or in any other manner, that those tools are "Made in U.S.A.," and (2) to return to Leatherman, at Leatherman's expense, all 22 tools at issue and any packaging and advertising relating to those tools representing that the tools are "Made in U.S.A.", and notify class members of the procedures for obtaining restitution.

### ·4. *Attorney Fees and Costs*

After the entry of judgment, plaintiffs filed a motion to recover their attorney fees and costs as the prevailing parties under the CLRA (Civil Code § 1780, subd. (d)) and under the private attorney general provisions of Code of Civil Procedure section 1021.5. The trial court awarded attorney fees in the total amount of $5,713,538 as follows: $2,971,808 for the Rossbacher Firm (Rossbacher), $2,644,285 for Cuneo Waldman & Gilbert, LLP (Cuneo), and $97,445 for Blecher & Collins, P.C. (Blecher). The fees awarded to Rossbacher, Cuneo and Blecher were the result of lodestar amounts of $1,485,904, $1,322,142.50, and $48,722.50, respectively, enhanced by a multiplier of two. The trial court granted in part and denied in part plaintiffs' motion for costs and awarded $81,970.84 in costs.

### D. *The Appeal*

Leatherman filed notices of appeal on July 26, 2004, September 24, 2004, and November 22, 2004. On February 2, 2005, we ordered that the appeals be consolidated. Pursuant to California Rules of Court, rule 13(c)(6), the Attorney General filed an amicus curiae brief in this action in support of the trial court's rulings on liability and the restitution award.

## II. DISCUSSION

### A. *Summary Adjudication*

Leatherman contends that the order granting summary adjudication of liability under the false advertising law, the unfair competition law, and the CLRA must be reversed because the trial court applied erroneous legal standards under these statutes. We review the trial court's order granting summary adjudication under the de novo or independent standard of review. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)[11]

---

[11] The parties have not raised whether Code of Civil Procedure section 437c, subdivision (f), authorized summary adjudication of only liability (see *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 96–98 [97 Cal.Rptr.2d 842]; *Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 519 [73 Cal.Rptr.2d 708]), and therefore any issue in that regard is forfeited.

### 1. *False Advertising Law and CLRA Claims*

Leatherman claims the trial court applied an incorrect legal standard under the false advertising law and the CLRA because the court focused on the component parts of a given tool rather than the tool as a whole. Leatherman also argues the trial court could not summarily determine that the tools at issue were falsely or deceptively advertised because such a determination would require a tool-by-tool analysis, which Leatherman claims the trial court did not do. As we discuss, the trial court did not err in its determination that Leatherman violated the false advertising law and the CLRA.

#### a. *False Advertising Law*

Section 17500 provides in relevant part: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property . . . to make or disseminate or cause to be made or disseminated before the public in this state . . . in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property . . . or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."[12]

■ Section 17500 has been broadly construed to proscribe " 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.' " (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951 [119 Cal.Rptr.2d 296, 45 P.3d 243].) In determining whether a statement is misleading under the statute, " 'the primary evidence in a false advertising case is the advertising itself.' " (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 100 [131 Cal.Rptr.2d 746] (*Brockey*).) The "misleading character" of a given representation "appears on applying its words to the facts." (*People v. Wahl* (1940) 39 Cal.App.2d Supp. 771, 774 [100 P.2d 550].)

#### b. *CLRA*

■ The CLRA proscribes certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to

---

[12] In addition, the unfair competition law defines unfair competition as including "any . . . unfair, deceptive, untrue or misleading advertising." (§ 17200.)

any consumer," including "[u]sing deceptive representations or designations of geographic origin in connection with goods or services." (Civ. Code, § 1770, subd. (a)(4).) The standards for determining whether a representation is misleading under the false advertising law apply equally to claims under the CLRA. (*Consumer Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1360 [8 Cal.Rptr.3d 22] (*Echostar*).) Conduct that is "likely to mislead a reasonable consumer" thus violates the CLRA. (*Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 54 [134 Cal.Rptr.2d 420].) The CLRA is to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (Civ. Code, § 1760; see *Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856, 869 [118 Cal.Rptr.2d 770].)

### c. *Consideration of Parts*

Leatherman argues that in determining liability under the false advertising law and the CLRA, the product should be "viewed as whole," rather than by its individual parts. The products at issue are 22 multipurpose, multicomponent tools that included at least one,[13] and in most cases more than one, of the following components: plier jaws, knives, corkscrews, files, clip plates, saws, knives, and Phillips screwdrivers. The trial court considered the importance of the foreign-processed parts to the tools as a whole and said, "Defendant argues that the tools were assembled in the United States and that only a few parts were made outside the USA. The problem is that those few parts are the significant parts of the tools, why the people buy them. The jaws, saws, files, knives, corkscrews, and Phillips screwdrivers are made in whole or in part outside of the United States. For the Court, that is the guts of the tools."[14] The trial court's position is consistent with common sense and the required liberal interpretation of the statutes. Thus, there was no error by the trial court in the approach it used to adjudicate liability under the false advertising law and the CLRA.

---

[13] The plier jaws that were investment cast in Mexico were used in 20 of the 22 Leatherman tools at issue in this case.

[14] Leatherman argues that findings contained in the statement of decision following the remedies trial cannot be used to support the trial court's summary adjudication order, citing *Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1074 [84 Cal.Rptr.2d 329] for the principle that an appellate court may consider " 'only the facts properly before the trial court at the time it ruled on the motion.' " The factual findings in the statement of decision as to the foreign manufacturing of the component parts incorporated into Leatherman's multipurpose tools are based upon the parties' moving and opposing papers in their respective motions for summary adjudication and not on additional facts adduced during the remedies phase of the trial. Our review of the summary adjudication is based only on the evidence submitted in connection with the summary adjudication motions.

### d. *No Issue of Material Fact*

Leatherman argues that the trial court erred in summarily adjudicating whether the "Made in U.S.A." representations were deceptive or misleading because the trial court could not, without a trial, determine whether each tool, individually and "as a whole," was "substantially" made outside the United States. The facts as to what was done abroad and what was done in the United States are not in dispute.

It is undisputed that each of the 22 tools at issue was a multifunction, multicomponent tool that included at least one, and in most cases three or more, of the following components: pliers, Phillips screwdrivers, files, clip plates, corkscrews, saws, locking T's, bit holders, knives, bolster file sides, and bolster knife sides. It is also undisputed that those components underwent manufacturing processes outside the United States.

Leatherman suggests a determination of whether its "Made in U.S.A." representations were deceptive under the false advertising law and the CLRA should be based on the substantiality of the work outside the United States, which Leatherman says is a factual question. It does not necessarily follow that in order for a "Made in U.S.A." designation to be deceptive, the product must be manufactured substantially outside the United States. Even if it did, as we discuss in connection with section 17533.7 (pt. II.A.2.c. *post*), as a matter of law, the tools at issue were substantially manufactured abroad.

Leatherman asserts that there was insufficient evidence to conclude as a matter of law that the "Made in U.S.A." representations were deceptive so as to be a violation of the false advertising law and the CLRA. Leatherman contends that "extrinsic evidence," such as expert testimony or consumer surveys, was necessary in this case to sustain the plaintiffs' burden, citing federal cases applying the Lanham Act (15 U.S.C. § 1125(a)) and the unfair competition law as support for its argument. (See *Churchill Village, L.L.C. v. General Electric Co.* (N.D.Cal. 2000) 169 F.Supp.2d 1119, 1131; *Cairns v. Franklin Mint Co.* (C.D.Cal. 1998) 24 F.Supp.2d 1013, 1041–1042; see also *Haskell v. Time, Inc.* (E.D.Cal. 1997) 965 F.Supp. 1398, 1407 ["anecdotal evidence alone is insufficient to prove that the public is likely to be misled"].)

■ The federal authorities cited by Leatherman "do not accurately reflect California law." (*Echostar, supra,* 113 Cal.App.4th 1351 at p. 1362; see *Nagel v. Twin Laboratories, Inc., supra,* 109 Cal.App.4th at p. 55.) As the court said in *Echostar, supra,* at page 1362, "we reject defendants' view that a plaintiff must produce a consumer survey or similar extrinsic

evidence to prevail on a claim that the public is likely to be misled by a representation. [Citation.]" The federal cases "have imported into the California UCL [unfair competition law] standards of proof derived from federal Lanham Act cases, where misleading, rather than false, statements must be shown to have deceived a 'significant portion' of the recipients." (*Brockey, supra*, 107 Cal.App.4th at p. 99.) As the court in *Brockey* said, "We are not persuaded that these cases accurately reflect Califonia law." (*Ibid.*) The court added that with regard to the showing of deception, " 'the primary evidence in a false advertising case is the advertising itself.' " (*Id.* at p. 100.)

A private plaintiff bears the burden of producing evidence and the burden of proof on a false advertising claim under the false advertising law and the unfair competition law. (*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336, 1346 [133 Cal.Rptr.2d 207].) To prevail on a false advertising claim, a plaintiff need only show that members of the public are likely to be deceived. (*Freeman v. Time, Inc.* (9th Cir. 1995) 68 F.3d 285, 289; see *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545] [" 'members of the public are likely to be deceived' " under section 17200]. A "reasonable consumer" standard applies when determining whether a given claim is misleading or deceptive. (*Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 512–513 [129 Cal.Rptr.2d 486] (*Lavie*).) A "reasonable consumer" is "the ordinary consumer acting reasonably under the circumstances" (*ibid.*), and "is not versed in the art of inspecting and judging a product, in the process of its preparation or manufacture . . . ." (1A Callmann on Unfair Competition, Trademarks and Monopolies (4th ed. 2004), § 5:17, p. 5-103; see *Lavie, supra*, at pp. 504–512.)

■ The evidence in this case included the "Made in U.S.A." representations themselves; the declaration of a Leatherman executive describing the various manufacturing processes the Leatherman tool components underwent outside the United States; and the testimony of two plaintiffs who attested to being misled by Leatherman's representations. Leatherman presented no evidence suggesting a lack of deception, but argued that the "Made in U.S.A." description was not deceptive because the products were designed, engineered, assembled, and finished in the United States, and thus were not substantially made outside the United States. The evidence that is not in dispute establishes that a significant portion of the various parts of the products were manufactured abroad. A reasonable consumer of Leatherman's products with the "Made in U.S.A." representation would not expect such foreign manufacturing. (See Fed. Trade Com., Enforcement Policy Statement on United States Origin Claims (Enforcement Policy) 62 Fed.Reg. 63756, 63768 (Dec. 2, 1997) ["consumers are likely to understand an unqualified U.S. origin claim to mean that the advertised product is 'all or

virtually all' made in the United States"].) No reasonable trier of fact could conclude otherwise. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856 [107 Cal.Rptr.2d 841, 24 P.3d 493].)[15] Thus, the "Made in U.S.A." representations were deceptive as a matter of law.

### 2. *Section 17533.7 and Unfair Competition Law Claims*

Leatherman contends the trial court's summary adjudication of the claims asserted under section 17533.7 must be reversed because the trial court's interpretation and application of that statute were erroneous. Leatherman further contends that as the trial court's ruling on the section 17533.7 claim was the primary basis for its ruling on the unfair competition law claim, summary adjudication of that claim must be reversed as well. We review the issue of statutory interpretation de novo. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251 [48 Cal.Rptr.2d 12, 906 P.2d 1112].) As discussed *post* in part II.A.2.c.(i), whether there was a violation, although a question of fact, may be resolved as a matter of law.

■ Section 17533.7 provides: "It is unlawful for any person, firm, corporation or association to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words 'Made in U.S.A.,' 'Made in America,' 'U.S.A.,' or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." In interpreting this statute, our goal is to determine the intent of the Legislature and thereby effectuate the purpose of the law. (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166].) To do so, we apply certain fundamental rules of statutory interpretation. " 'Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175]; see Civ. Code, § 3542 ["Interpretation must be reasonable"].)

■ In reviewing the statutory language, we reject an interpretation that would render particular terms mere surplusage, and instead seek to give significance to every word. (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 55 [19 Cal.Rptr.2d 73, 850 P.2d 621].) "When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of

---

[15] Compare *Lavie, supra,* 105 Cal.App.4th at page 503 ("The standard to be used in evaluating whether an advertisement is deceptive under the UCL is purely a question of law . . . .") with *Echostar, supra,* 113 Cal.App.4th at pages 1361–1362 (question of fact whether "representations are likely to deceive a reasonable consumer").

extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].) Here, we have not found any helpful legislative history, and there are no similar statutes in other jurisdictions. Thus, we rely on the language itself and the apparent purpose of the statute.

### a. *Merchandise or Any Part Thereof*

Leatherman contends that section 17533.7 should be interpreted to allow a "Made in U.S.A." designation even if one part of the product was substantially made outside the United States. It argues that to apply the statute literally would cause an absurd result by prohibiting a "Made in U.S.A." designation on a product even if a single part, such as one screw, was "entirely or substantially" made outside the United States.

■ The language of section 17533.7 is clear—a product may not be represented as "Made in U.S.A." if the product itself, "or *any* article, unit, or *part thereof*, has been entirely or substantially made . . . outside of the United States." (Italics added.) We cannot ignore that language. ■ "It is our task to construe, not to amend, the statute. 'In the construction of a statute . . . the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted. . . .' [Citation.] We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

The statute as applied here does not lead to an absurd result. The uncontradicted evidence shows that multiple parts of Leatherman's tools were substantially made outside the United States.[16] The statute does not state, as Leatherman would have us interpret it, that a product may be represented as "Made in U.S.A." if a substantial number or a majority of its parts are made in the United States. Under section 17533.7, merchandise cannot be represented as "Made in U.S.A." if the merchandise, or any article, unit, or part of that merchandise, was entirely or substantially made, manufactured, or produced outside of the United States.[17]

---

[16] Leatherman's assertion that the trial court granted summary adjudication because of only one component—the jaw half of the pliers—is unsupported by the record. The trial court concluded that multiple parts of the tools at issue (e.g., plier jaws, Phillips screwdrivers, saws, files, corkscrews, and tweezers) were substantially made outside the United States.

[17] Because of the circumstances presented here, we need not address whether the Legislature intended to exempt from the requirements of section 17533.7 products containing only a single

### b. *Made, Manufactured, or Produced*

■ Section 17533.7 prohibits a "Made in U.S.A." designation if a product or its components were "entirely or substantially made, manufactured, or produced outside of the United States." The statute does not define the terms "made, manufactured, or produced." Leatherman contends that we must consider the work done in the United States to design, engineer, procure, finish, and test Leatherman's tools. Even if we did, the domestic design or processing of the merchandise or of the part does not necessarily render the foreign work performed on the part unsubstantial. Moreover, the phrase "made, manufactured, or produced" is in the disjunctive. If any one of those processes substantially takes place outside the United States, the use of the "Made in U.S.A." designation would be unlawful.

The plain meaning of "made" is "artificially produced by a manufacturing process." (Webster's 3d New Internat. Dict. (2002) p. 1356.) "Manufacture" means "something made from raw materials by hand or by machinery." (*Id.* at p. 1378.) "Process" means "prepared, handled, treated, or produced by a special process: as made by some special synthetic process." (*Id.* at p. 1808.) These terms describe the *physical* process of transforming raw materials into goods.

■ In contrast, the terms "design," meaning "to conceive and plan out in the mind" (Webster's 3d New Internat. Dict., *supra,* p. 611), and "engineer," meaning "to design or produce by the methods of engineering" or "to contrive or plan out" (*id.* at p. 752), encompass the mental processes of planning or conceptualizing a product. The terms "made, manufactured, or produced" do not necessarily include the mental processes of design and engineering, or the administrative tasks of procurement and quality control testing.[18] But even if they did, as discussed *post,* a comparison of what was done within the United States and outside the United States is not determinative.

---

foreign-made part, such as a single screw, when that part is of minimal importance, value, degree, or amount in relation to the product as a whole, and every other part of the product is made in the United States. (See Civil Code, § 3533 ["[t]he law disregards trifles"].)

[18] Leatherman asks that we take judicial notice of the following definition of "manufacturing" set forth in the APICS Dictionary (10th ed. 2002): "A series of interrelated activities and operations involving the design, material selection, planning, production, quality assurance, management, and marketing of discrete consumer and durable goods." APICS, the Association for Operations Management, is an industry association, the mission of which is to provide information and services in production and inventory management. (See <http://www.apics.org/about/mission> [as of Jan. 10, 2006].) An industry association's definition of "manufacturing," for purposes of production management and inventory control, has minimal relevance when determining the "plain and commonsense meaning" of the term in the context of a consumer protection statute intended to safeguard buyer expectations. We deny this request for judicial notice.

### c. *"Substantially" Manufactured*

Section 17533.7 prohibits a "made in U.S.A." representation with respect to "merchandise or any article, unit, or part thereof, [that] has been entirely or substantially" manufactured outside the United States. The statute does not define the term "substantially," nor have we found any legislative history or administrative regulation that is helpful in interpreting that term. Leatherman contends that a triable issue of fact exists as to whether the component parts of its tools were "substantially" made, manufactured, or produced outside the United States, to determine if its "Made in U.S.A." representations violated section 17533.7. Leatherman further contends that determining whether a part was "substantially" manufactured abroad requires a comparative evaluation of the work done on a part within the United States and the work performed outside the United States, and that the determination necessarily involves questions of fact that preclude summary adjudication. Leatherman suggests that a quantitative, rather than a qualitative analysis is necessary, and that the comparison should involve an objective measure such as domestic and foreign production costs or relative worker hours. Leatherman offers "much greater than 51%" of such an objective measure as a benchmark for determining whether a product or part was "substantially" made, manufactured, or produced outside the United States.

### (i) *Fact or Law*

Whether "a determination is one of ultimate fact" that "can be reached by logical reasoning from the evidence" or "one of law" that "can be reached only by the application of legal principles" (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 698, fn. 3 [139 Cal.Rptr. 700, 566 P.2d 602]; see *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278]) is not always an easy question. In contexts other than section 17533.7, authorities treat the issue of substantiality as a question of fact. (See *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 375 [33 Cal.Rptr.3d 644] [racial discrimination as substantial factor in adverse employment decision under Fair Employment and Housing Act, Gov. Code, § 12940, subd. (a), a jury question]; *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.* (1997) 520 U.S. 17, 38–39 [137 L.Ed.2d 146, 117 S.Ct. 1040] [noted that prior cases have deemed substantial equivalent test in patent infringement cases to be factual issue, although declined to decide whether factual or legal]; *Maxwell v. K Mart Corp.* (D.Minn. 1994) 844 F.Supp. 1360, 1370–1371 [substantially equivalent in patent infringement case question for jury—"The significance of the similarities and differences between the accused and patented systems presents a genuine issue of material fact . . ."]; *Williams v. Philadelphia Housing* (3rd Cir. 2004) 380 F.3d 751, 763 [question

of whether individual is substantially limited in a major life activity under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., a question of fact]; CACI No. 430 (2005) [causation: substantial factor]; BAJI No. 3.76 (2005) [cause: substantial factor test]; Prosser, *Proximate Cause in California* (1950) 38 Cal. L.Rev. 369, 379 [" 'substantial factor' " a term "sufficiently intelligible to any layman to furnish an adequate guide to the jury . . . ."]; Rest.2d Torts, § 431 [negligent conduct must be a substantial factor in bringing about harm to constitute legal cause].) But authorities recognize that substantiality may be resolved by summary judgment in appropriate circumstances as any other factual issue. (See *Warner-Jenkinson Company v. Hilton Davis Chemical Co., supra*, 520 U.S. at p. 39, fn. 8 ["Where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment."]; *Bristol v. Bd. of County Com'rs. of Clear Creek* (10th Cir. 2002) 281 F.3d 1148, 1156, 1157, 1161, vacated in part on different grounds, (10th Cir. 2002) 312 F.3d 1213 (en banc) [question of whether an impairment is substantially limiting under the ADA is ordinarily a factual question but one that may be evaluated by the court on a motion for summary judgment]; *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.* (Fed.Cir. 2002) 285 F.3d 1353, 1360 [summary judgment of noninfringement under the doctrine of equivalents appropriate if "no reasonable jury could determine two elements to be equivalent"].)

### (ii) *"Substantially" as "Considerable" or "To a Large Degree"*

The United States Supreme Court in undertaking to define "substantially" as that term is used in the ADA[19] said, " '[substantially,]' . . . suggests 'considerable' or 'to a large degree.' See Webster's Third New International Dictionary 2280 (1976) (defining 'substantially' as 'in a substantial manner' and 'substantial' as 'considerable in amount, value, or worth' and 'being that specified to a large degree or in the main'); see also 17 Oxford English Dictionary 66–67 (2d ed. 1989) ('substantial': '[r]elating to or proceeding from the essence of a thing; essential'; '[o]f ample or considerable amount, quantity, or dimensions')." (*Toyota Motor Mfg., Ky., Inc. v. Williams* (2002) 534 U.S. 184, 196–197 [151 L.Ed.2d 615, 122 S.Ct. 681].) Guidance for determining whether a product or part was "substantially" made outside the United States for purposes of evaluating a "Made in U.S.A." representation may also be found under parallel federal consumer protection laws. Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45) prohibits "unfair or

---

[19] To qualify as disabled under the ADA, a claimant must show that he or she has "substantial" limitations to a major life activity. The statute defines "disability" in part as follows: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ." (42 U.S.C. § 12102(2)(A).)

deceptive acts or practices," and the Federal Trade Commission (FTC), the agency responsible for enforcing that statute, has long prohibited claims that a product was "Made in U.S.A." unless the product advertised was wholly of domestic origin. (*In the Matter of Windsor Pen Corp.* (1964) 64 F.T.C. 454; *Vulcan Lamp Works, Inc.* (1940) 32 F.T.C. 7.) In 1994, the FTC restated this standard to require that a product advertised as "Made in U.S.A." be "all or virtually all" made in the United States. (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63756, fn. 2.)

In 1997, the FTC undertook a comprehensive review of United States (U.S.) origin claims and examined whether its "traditional standard for evaluating such claims remained consistent with consumer perceptions and continued to be appropriate in today's global economy." (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63756.) As part of the review process, the FTC undertook a two-part study to examine consumer understandings of U.S. origin claims and conducted public workshops with representatives of industry, consumer groups, unions, government agencies, and other interested parties. (*Ibid.*) That process culminated in the promulgation of an enforcement policy that restates the FTC's "all or virtually all" standard as follows: "[C]onsumers are likely to understand an unqualified U.S. origin claim to mean that the advertised product is 'all or virtually all' made in the United States. . . . [¶] A product that is all or virtually all made in the United States will ordinarily be one in which all significant parts and processing that go into the product are of U.S. origin. In other words, where a product is labeled or otherwise advertised with an unqualified 'Made in USA' claim, it should contain only a de minimis, or negligible, amount of foreign content." (*Id.* at p. 63768, fn. omitted.)[20]

The FTC's Enforcement Policy states that "[a]lthough there is no single 'bright line' to establish when a product is or is not 'all or virtually all' made in the United States, there are a number of factors that the [FTC] will look to in making this determination." (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63768.) As a *threshold matter*, the FTC views the location of a product's final assembly as a crucial factor in evaluating where a product is "made." (*Ibid.*) The Enforcement Policy states that "it is a *prerequisite* that the product have been last 'substantially transformed' in the United States." (*Ibid.*, italics added.) After making this threshold determination, the FTC "will also examine the percentage of the total cost of manufacturing the product that is attributable to U.S. costs (i.e., U.S. parts and processing) and to foreign

---

[20] The word "parts" is defined as "all physical inputs into a product, including but not limited to subassemblies, components, parts, or materials." (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63768, fn. 112.) We note that the FTC limits its analysis to "physical inputs into a product," and apparently excludes mental processes such as design and engineering.

costs."[21] The Enforcement Policy goes on to state that "there is not a fixed point for all products at which they suddenly become 'all or virtually all' made in the United States. Rather the [FTC] will conduct this inquiry on a case-by-case basis, balancing the proportion of U.S. manufacturing costs along with the other factors discussed herein, and taking into account the nature of the product and consumers' expectations. . . ." (*Id.* at p. 63769.)

Another factor the FTC considers in evaluating whether foreign content is significant enough to prevent a product from being represented as all or virtually all made in the United States is how far removed the foreign content is from the finished product. (Enforcement Policy, *supra,* 62 Fed. Reg. at p. 63769.) The Enforcement Policy provides two examples: "[I]n the context of a complex product, such as a computer, it is likely to be insignificant that imported steel is used in making one part of a single component (e.g., the frame of the floppy drive). This is because the steel in such a case is likely to constitute a very small portion of the total cost of the computer, and because consumers purchasing a computer are likely, if they are concerned about the origin of the product, to be concerned with the origin of the more immediate inputs (floppy drive, hard drive, CPU, keyboard, etc.) and perhaps the parts that, in turn, make up those inputs. Consumers are less likely to have in mind materials, such as the steel, that are several steps back in the manufacturing process. By contrast, in the context of a product such as a pipe or wrench for which steel constitutes a more direct and significant input, the fact that the steel is imported is likely to be a significant factor in evaluating whether the finished product is all or virtually all made in the United States." (*Ibid.*)

"All or virtually all made in the United States," as used by the FTC in United States origin claims is different than the "entirely or substantially" made outside the United States language of section 17533.7. Nevertheless, the policies underlying the federal and California laws are the same. The object is to protect consumers from being misled when they purchase products in the belief that they are advancing the interests of the United States and its industries and workers. (Sen. Holmdahl, sponsor of Sen. Bill No. 1004 [which became § 17533.7] (1960–1961 Reg. Sess.), letter to Governor Brown, May 23, 1961) ["There are many Americans who feel that American-made articles are of higher quality, and who rely on the 'Made in U.S.A.' label"].)

---

[21] The Enforcement Policy further states that "[i]n calculating manufacturing costs, manufacturers should ordinarily use as their measure the cost of goods sold or finished goods inventory cost, as those terms are used in accordance with generally accepted accounting principles. Such costs will generally include (and be limited to) the cost of manufacturing materials, direct manufacturing labor, and manufacturing overhead." (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63769, fn. 114.)

### (iii) *Leatherman's Contentions Regarding the Meaning of "Substantially"*

Leatherman maintains that the term "substantially" in section 17533.7 should not refer to "any non-*de minimis* offshore contribution to the manufacture of either the entire product or even a single part thereof." Leatherman argues that the principle of statutory interpretation known as *ejusdem generis* should be applied here. Under that principle, when a statute contains a list of items, the court interpreting that statute should determine the meaning of each item by reference to the others, and give preference to an interpretation that uniformly treats items similar in nature and scope. (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011–1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].) A court will "adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." (*Ibid.*) According to Leatherman, "substantially" is simply an alternative to "entirely." But this is not the type of list to which the principle of *ejusdem generis* applies.

Leatherman argues that the words "has been entirely or substantially made" suggest that "substantially" means almost or close to "entirely" because a product that is "entirely" made abroad is necessarily "substantially" made abroad. According to Leatherman, the word "entirely" would be surplusage if "substantially" meant much less than "entirely." Leatherman's argument, however, fails to be consistent with its own proposed criterion of much more than 51 percent. Finally, Leatherman argues that unless its interpretation is accepted, hardly any product could carry the "Made in U.S.A." designation. But, if a considerable—i.e., substantial—portion of a product or its components is made abroad, the product should not carry that designation.

Determining whether the products were "substantially" made outside the United States does not, as Leatherman suggests, require a quantitative analysis based on some objective measure, such as foreign versus domestic manufacturing costs or relative worker hours. The FTC's Enforcement Policy cautions that "the percentage of manufacturing costs attributable to foreign parts and process may not reflect the true extent of foreign content. Where only a small amount of domestic processing takes place and the bulk of the work on the product is performed abroad, or a significant component is manufactured abroad, it may be possible that, because of lower costs for foreign parts and labor, foreign costs may be disproportionately low relative to the amount of foreign production . . . . In such circumstances, it may be preferable to look more generally at the significance of the foreign inputs rather than evaluate their extent entirely in terms of cost." (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63765, fn. 93.) The comparison of what was

done with regard to the product or part in the United States with what was done abroad is just one factor to consider. We need not adopt or apply a formulaic approach in determining whether a product was "substantially" made abroad and therefore do not accept Leatherman's proposed measure of "much more than 51%" when assessing the foreign content of its products.

> (iv) *Undisputed Facts Show as a Matter of Law That Parts Were Substantially Made Abroad*

In support of their motion for summary adjudication, plaintiffs introduced evidence, consisting of Leatherman's discovery responses and the deposition testimony of Leatherman's executives, showing that the components incorporated into the Leatherman tools at issue underwent manufacturing processes outside the United States. These components included: a file that was fineblanked in Switzerland and that had its teeth cut and hardened in Switzerland or Austria; plier jaws, Phillips screwdrivers, bolster file sides, and bolster knife sides that were investment cast in Mexico; a clip plate that was fineblanked, deburred, formed, hardened, and polished in Switzerland; a locking T that was fineblanked and hardened in Switzerland; a bit holder that was machined in Canada; a saw blade that had its profile cut in Switzerland or Germany and that was fineblanked and hardened in Switzerland; handles that were fineblanked in Switzerland; a serrated knife blade that was fineblanked in Switzerland; and corkscrews that were forged, coiled, hardened, and polished in France. The components that underwent foreign processing were incorporated, in varying combinations, into the 22 Leatherman tools at issue.

Leatherman did not dispute that component parts used in its tools underwent manufacturing processes abroad, but countered with evidence that work was also performed on those components within the United States. Leatherman provided the declaration of an executive attesting to the following work done within the United States with respect to all components: design; drawings and specifications; engineering; prototype building and testing; procurement for facilities, tooling and equipment; assembly; and quality assurance work. The executive further stated in his declaration that the following work was done in the United States after the components had undergone processing abroad: with respect to the plier jaws—coining, reaming, cleaning, hardening, riveting, torque and tension testing and adjusting, grinding and sanding; with respect to the Phillips screwdrivers—reaming, cleaning, hardening, polishing, grinding, and demagnetizing; with respect to the files—blanking, polishing, and for some of the years at issue, some files were fineblanked in the United States; with respect to the bolsters—

hardening, bead blasting, air cleaning, grinding, and demagnetizing; with respect to the knife blade—hardening, grinding, polishing, and sharpening; with respect to handles—bending, hardening, polishing, bead blasting, air cleaning, and deburring; and with respect to bit holders—richwood cutdown and polishing.

█ The trial court did not err by concluding, as a matter of law, that the Leatherman tools at issue had component parts that were substantially made, manufactured, or produced outside the United States. No reasonable trier of fact could find that the goods were not substantially made, manufactured, or produced abroad. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 856.) The foreign inputs into various parts in each tool were both "considerable" and "to a large degree" relative to the parts—and even to the tool as a whole. (See *Toyota Motor Mfg., Kentucky, Inc. v. Williams, supra,* 534 U.S. at pp. 196–197.)

Although Leatherman may have met the "threshold" or "prerequisite" referred to in the FTC Enforcement Policy (Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63768) by assembling its products in the United States, under section 17533.7, the relevant issue in this case is whether a "part" of the product was substantially manufactured outside the United States. Although the tools were designed, assembled and finished in the United States, the foreign inputs into the tools and their component working parts were direct, significant, and not far removed from the finished product. (See Enforcement Policy, *supra,* 62 Fed.Reg. at p. 63769.) The casting, forging, cutting, and forming of metal parts constituted a direct and significant input into those parts and the tools. The amount of foreign input into these tools would conflict with the expectations of an American consumer that he or she had purchased an American-made product.

### (v) *Not Unconstitutionally Vague*

█ The absence of a formula or statutory definition for determining when a product or part is "substantially" made, manufactured, or produced abroad does not render section 17533.7 unconstitutionally vague, as argued by Leatherman. A statute is not unconstitutionally vague merely because its meaning "must be refined through application." (*Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 367 [185 Cal.Rptr. 453, 650 P.2d 328].) "The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms. . . . Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences

of mankind." (*People v. Daniels* (1969) 71 Cal.2d 1119, 1128–1129 [80 Cal.Rptr. 897, 459 P.2d 225]; see *Rutherford v. State of California* (1987) 188 Cal.App.3d 1267, 1276 [233 Cal.Rptr. 781] ["substantially divert" not unconstitutionally vague. "[S]tatutes will be upheld unless their unconstitutionality as to vagueness clearly, positively and unmistakenly appears"]; *In re Terry H.* (1995) 40 Cal.App.4th 1675 [47 Cal.Rptr.2d 791] ["substantially similar" not unconstitutionally vague].)

### B. *Remedy*

At the trial on the remedy, plaintiffs introduced evidence consisting of the testimony of persons who purchased in California Leatherman tools represented as "Made in U.S.A." Plaintiffs elicited testimony of witnesses that their decisions to purchase the tool products were influenced by the "Made in U.S.A." designation. Plaintiffs presented testimony concerning Leatherman's Web site and hyperlinks connecting that Web site to those of retailers who sold Leatherman products. Many of the retailer sites contained representations that Leatherman's tools were "Made in U.S.A." Plaintiffs also introduced advertisements and pricing information for the Leatherman tools, the Leatherman tools themselves, the packaging in which those tools were sold, several allegedly comparable tools made by foreign manufacturers, and expert testimony comparing the functionality of the Leatherman tools with that of the tools made by foreign manufacturers. Plaintiffs' expert testified that "Made in U.S.A." representations have a significant, positive impact on consumer purchasing decisions and that Leatherman realized a substantial advantage by using such a representation, but that advantage was not quantified. Plaintiffs introduced into evidence Leatherman's financial statements; the retail and wholesale prices of Leatherman's tools; the retail prices of other allegedly comparable, foreign-made tools; and the unit sales, gross revenues, and gross profits from California sales of the Leatherman tools at issue.

Leatherman introduced the testimony of an executive describing the manufacturing processes undertaken in the United States on the plier jaws used in the Leatherman tools after the plier jaws were investment cast in Mexico, and videotapes depicting the domestic processing. Leatherman also presented videotapes showing the assembly of certain Leatherman tools in the United States. A Leatherman executive testified that with respect to certain tools, the majority of parts are made entirely in the United States. When plaintiffs objected that this evidence was relevant only to the summary adjudication motion the trial court had already granted in plaintiffs' favor, Leatherman stated that the evidence was being introduced solely for the purpose of refuting plaintiffs' punitive damages claim, and the trial court admitted the evidence for this limited purpose. Plaintiffs ultimately declined to seek punitive damages.

Leatherman presented testimony concerning its worldwide net sales, operating expenses, cost of goods sold, and gross margins; the amount Leatherman spent on its American employees between 1997 and 2002; and unit sales of its products to entities in California. Leatherman's executives testified that the packaging in which Leatherman's products were sold bore unqualified "Made in U.S.A." representations from 1997 until 2001, when the company changed its packaging to include qualified representations stating that the product was "Made in U.S.A. with U.S. and foreign components."

## 1. *Restitution Award*

The false advertising law, the unfair competition law, and the CLRA authorize a trial court to grant restitution to private litigants asserting claims under those statutes. (*Cortez, supra,* 23 Cal.4th at p. 180; *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 452 [153 Cal.Rptr. 28, 591 P.2d 51] (*Fletcher*).) Section 17203 of the unfair competition law expressly authorizes courts to make "such orders . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person . . . any money or property, real or personal, which may have been acquired by means of such unfair competition."

Section 17535 of the false advertising law provides: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful." "The restitutionary remedies of sections 17203 and 17535 . . . are identical and are construed in the same manner." (*Cortez, supra,* 23 Cal.4th at p. 177, fn. 10.)

The CLRA provides that an aggrieved consumer may bring an action to recover "[r]estitution of property." (Civ. Code, § 1780, subd. (a)(3).) There is nothing to suggest that the restitution remedy provided under the CLRA should be treated differently than the restitution remedies provided under the false advertising or unfair competition laws.[22]

---

[22] The discussion of restitution under the unfair competition and false advertising laws applies to restitution under the CLRA.

 Leatherman contends that the restitution order must be reversed because it conflicts with the trial court's ruling not awarding damages under the CLRA. Leatherman further contends that the amount of the restitution award is unsupported by the evidence. Because a court " '*may* make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore . . . money or property[,]' " the "courts' discretion is very broad" as to the remedy it awards. (*Cortez, supra,* 23 Cal.4th at pp. 179–180 [§ 17203].) As we discuss, there was no inconsistency in the trial court's rulings. There is no evidence, however, to support the amount of the restitution award, and therefore the trial court erred in granting that award.

### a. *No Inconsistency In Rulings*

 Damages under the CLRA on the one hand and restitution under the false advertising and unfair competition laws on the other hand are different remedies. Damages under the CLRA are a legal remedy, intended to compensate those who suffer actual damage. (*Wilens v. TD Waterhouse Group, Inc.* (2003) 120 Cal.App.4th 746, 754 [15 Cal.Rptr.3d 271].) Damages are not available under the false advertising and unfair competition laws because restitution is the only available remedy under those statutes.[23] (*Korea Supply, supra,* 29 Cal.4th at p. 1144; *Chern v. Bank of America, supra,* 15 Cal.3d at p. 875; *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789]; see *Kraus v. Trinity Management Services, Inc., supra,* 23 Cal.4th at pp. 130–132, 137.) The relief provided by those statutes may involve "equitable considerations." (*Cortez, supra,* 23 Cal.4th at p. 179; see *Korea Supply, supra,* 29 Cal.4th at p. 1150 ["the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices"].)

 Under the false advertising and unfair competition laws, the remedy of restitution serves two purposes—returning to the plaintiff monies in which he or she has an interest and deterring the offender from future violations. (*Fletcher, supra,* 23 Cal.3d at p. 450 [trial court has "broad authority" under unfair competition law to fashion a remedy to deter defendant from engaging in future unfair trade practices]; *People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 135 [3 Cal.Rptr.3d 429] ["statutory restitution is not solely 'intended to benefit the [victims] by the

---

[23] In this case, we address only private individual actions brought under the statutes. In public actions, civil penalties are available. (§ 17206; *Korea Supply, supra,* 29 Cal.4th at p. 1148, fn. 6.)

return of money, but instead is designed to penalize a defendant for past unlawful conduct and thereby deter future violations' "].)

Because the damages provision of the CLRA is to compensate for actual loss, and restitution under the false advertising and unfair competition laws are for different purposes—deterrence and restoration of property acquired unlawfully—a trial court could, when assessing *damages* under the CLRA, apply standards different from those the trial court might use when ordering *restitution* under the false advertising or unfair competition laws. Such was the case here.

Leatherman's claim that the trial court applied the same "measure" for determining damages under the CLRA and restitution under the false advertising and unfair competition laws is unsupported by the record. The trial court stated that it was applying an "actual value" or "market value" approach to determine compensatory damages, and that an award of the $1,000 statutory minimum was necessary because the court was unable to determine either actual retail prices or the retail price differential between Leatherman's tools and other, allegedly similar, foreign-made tools sold in California during the same time period. In ordering restitution, the trial court used Leatherman's gross receipts, based on unit wholesale prices and unit sales information on the tools at issue, and determined that 25 percent of those gross receipts should be the amount of restitution for Leatherman's statutory violations and for the plaintiffs' failure "to receive the full measure of the product the consumer believed he or she was receiving at the time of purchase."

Because the trial court did not use the same formula or same principles in its consideration of compensatory damages under the CLRA as it did when determining the appropriate amount of restitution under the false advertising and unfair competition laws, there is no inconsistency in the trial court's rulings on damages and restitution. That, however, is not determinative of whether the amount of the trial court's award of restitution is justified.

### b. *No Evidentiary Support*

The false advertising and unfair competition laws authorize a trial court to make orders "as may be necessary to prevent the use or employment by any person" of any practice which constitutes unfair competition or deceptive advertising or which "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of" such unfair or deceptive act. (§§ 17203, 17535.) The California Supreme Court has made clear that the dual purposes of restoration and deterrence served by these statutes are concurrent rather than independent,

and has refused to permit a monetary award of disgorgement of profits or receipts that was not restitutionary in nature under those statutes. (*Korea Supply*, *supra*, 29 Cal.4th at p. 1152 [court's powers under § 17203 do not include nonrestitutionary disgorgement of profits]; *State v. Altus Finance*, *supra*, 36 Cal.4th at pp. 1304–1305, fn. 7 ["outside the class action context, a disgorgement remedy . . . is not authorized"]; *Kraus v. Trinity Management Services, Inc.*, *supra*, 23 Cal.4th at p. 137 ["the Legislature has not expressly authorized monetary relief other than restitution in UCL [unfair competition law] actions, but has authorized disgorgement into a fluid recovery fund in class actions"]; *Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997 [36 Cal.Rptr.3d 592]; *Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 455–459 [30 Cal.Rptr.3d 210] [nonrestitutionary disgorgement not available in statutory unfair competition case even if brought as a class action]; see *Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 338–339 [74 Cal.Rptr.2d 55] (*Day*) [§ 17203 not intended as solely punitive provision].) With respect to the unfair competition law, the Supreme Court stated, "[a] court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices." (*Korea Supply*, *supra*, 29 Cal.4th at p. 1148.) Thus, the courts do not have "*unlimited* equitable powers." (*Id.* at p. 1147.)

In this case, the trial court intended its restitution order to be restorative in that Leatherman was ordered to pay restitution only to persons who purchased the tools at issue in California during the class period. The trial court did not purport to impose a disgorgement remedy, even if it could. (*State v. Altus Finance*, *supra*, 36 Cal.4th at p. 1304, fn. 7; *Korea Supply*, *supra*, 29 Cal.4th at pp. 1144–1145; *Kraus v. Trinity Management Services, Inc.*, *supra*, 23 Cal.4th at pp. 126–127, 137 [disgorgement "may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons"].) At issue is the amount of restitution necessary to make injured consumers whole and whether there must be evidence to support that amount.

There must be evidence that supports the amount of restitution necessary to restore to the plaintiff "any money . . . which may have been acquired by means of such unfair competition." (§ 17203.) The Supreme Court has made clear that the "object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (*Korea Supply*, *supra*, 29 Cal.4th at p. 1149; see *State v. Altus Finance*, *supra*, 36 Cal.4th at pp. 1304–1305; *Kraus v. Trinity Management Services, Inc.*, *supra*, 23 Cal.4th at pp. 126–127.) Thus, "restitutionary awards encompass quantifiable sums one person owes to another . . . ." (*Cortez*, *supra*, 23 Cal.4th at p. 178.) These awards are for "money that once had been in the possession of the person to whom it [is] to be restored." (*Id.* at p. 177; see *Korea Supply*, *supra*, 29 Cal.4th at p. 1149 ["restitution is broad enough to allow a plaintiff to

recover money or property in which he or she has a vested interest"].) With respect to a court's equitable powers under the false advertising law, the Supreme Court has stated: "A court of equity may exercise its full range of powers 'in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved.' " (*Fletcher, supra,* 23 Cal.3d at p. 452, quoting *People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 286 [107 Cal.Rptr. 192, 507 P.2d 1400].)

In *Day, supra,* 63 Cal.App.4th at pages 338 to 339, the court stated: "section [17203] itself provides for the 'restoration' of money or property acquired by means of unfair competition. We think it significant that the Legislature chose to use the word 'restore' in labeling that which an offending defendant may be ordered to do. The verb, as defined by the Oxford English Dictionary, means '[t]o give back, to make return or restitution of (anything previously taken away or lost).' [Citation.] Taken in the context of the statutory scheme, the definition suggests that section 17203 operates only to return to a person those *measurable amounts* which are *wrongfully taken* by means of an unfair business practice. . . . While it may be that an order of restitution will also serve to deter future improper conduct, in the absence of a measurable loss the section does not allow the imposition of a monetary sanction merely to achieve this deterrent effect. Nor is the section intended as a punitive provision, though it may fortuitously have that sting when properly applied to restore a victim to wholeness." From the authorities we conclude that restitution under the statutes involved here must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence.

Section 17535 of the false advertising law provides for restitution of amounts "which may have been acquired by means of any practice in this chapter to be declared to be unlawful." The Supreme Court has interpreted this language as "unquestionably broad enough to authorize a trial court to order restitution without requiring the often impossible showing of the individual's lack of knowledge of the fraudulent practice in each transaction." (*Fletcher, supra,* 23 Cal.3d at p. 451.) The court did not suggest, however, that the statutory language requires no evidentiary showing as to the *amount* that should be returned to the victims. The statute should not be so read. That the trial court may have discretion as to whether to order restitution as a remedy (*Cortez, supra,* 23 Cal.4th at pp. 179–180) does not mean that when it does, it may select an amount unsupported by evidence.

The Restatement of Restitution provides support for our conclusion. Section 151 of the Restatement of Restitution provides: "Where a person is entitled to a money judgment against another because by fraud, duress or other

consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it." (Rest., Restitution, § 151, p. 598.) The Restatement also suggests that expert testimony may be necessary to establish the appropriate measure of recovery when there is no market for the product at issue: "The value of property is its exchange value measured in money, or the amount for which it could be exchanged if there were an open market with a wide opportunity for buyers. In the case of land there is ordinarily no such market by which the value can be determined, in which case as in other cases where there is no market the value must be determined by the opinion of those having such information as gives them a basis for judgment." (*Id.*, com. b, pp. 599–600.) The Restatement contemplates restitution supported by evidence.

■■■■■ Whether restitution is in the form of an equitable remedy or legal remedy, the relief is based on a specific amount found owing. When in law, the plaintiff recovers a sum of money " 'to pay for some benefit the defendant had received from him' " (*Great-West Life & Annuity Ins. Co. v. Knudson* (2002) 534 U.S. 204, 213 [151 L.Ed.2d 635, 122 S.Ct. 708]), and when in equity, the plaintiff can seek "in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." (*Ibid.*)[24]

Another statutory restitution framework that, as the statutes involved here, serves the dual purposes of compensating victims and deterring perpetrators, is victim restitution under Penal Code section 1203.1. (*People v. Harvest* (2000) 84 Cal.App.4th 641, 647–648 [101 Cal.Rptr.2d 135] [restitution order has compensatory and penal purposes, but "primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime"].) Courts have held that a restitution award under the victim restitution law must be supported by substantial evidence. (*People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1083 [32 Cal.Rptr.3d 518] [amount of restitution award under Pen. Code, § 1203.1 supported by substantial evidence].) Under the Penal Code, "[r]estitution orders may not be based merely upon the trial court's subjective belief regarding the appropriate compensation; there must be a factual and rational basis for the amount ordered . . . ." (*People v.*

---

[24] "[T]he terms *equity* and *equitable* are not always used to refer to remedial characteristics of a case. . . . [*E*]*quitable* . . . sometimes refers to fairness, sometimes to the jurisdictional mass of equity precedent, sometimes to remedies." (Dobbs, Law of Remedies (2d ed. 1993) Meaning of Equity, § 2.1(3), p. 55; see 12 Corbin on Contracts (interim ed. 2002) Restitution, § 1103, p. 10 ["The remedy of restitution . . . can not properly be described as either 'legal' or 'equitable' in any narrowly restricted signification of those terms"].)

*Carbajal* (1995) 10 Cal.4th 1114, 1125 [43 Cal.Rptr.2d 681, 899 P.2d 67].) Restitution awards made pursuant to a common law equitable unjust enrichment theory must also be supported by substantial evidence. (*County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1279, fn. 9 [90 Cal.Rptr.2d 41] [amount of restitution ordered in action against city redevelopment agency for breach of contract and unjust enrichment supported by substantial evidence]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 628 [12 Cal.Rptr.2d 741] [plaintiff's failure to present evidence concerning degree to which defendant was enriched was basis for nonsuit in action based on unjust enrichment theory].)

■ The amount of restitution awarded under the false advertising and unfair competition laws and the CLRA must be supported by substantial evidence. Although a trial court has broad discretion under those statutes to grant equitable relief, that discretion is not "unlimited" (*Korea Supply, supra,* 29 Cal.4th at p. 1147), and does not extend beyond the boundaries of the parties' evidentiary showing.

Substantial evidence does not support the trial court's restitution award in this case. Although plaintiffs presented evidence concerning the market value or retail price of Leatherman's tools, and the market price of similar tools that were made in China, the trial court rejected that evidence and did not rely on it as the basis for its restitution award. The trial court also rejected as "inequitable" Leatherman's gross profits as an appropriate measure of either the unlawful benefit to Leatherman or the amount necessary to restore consumers to the position in which they would have been but for the unlawful conduct. (See *Cortez, supra,* 23 Cal.4th at p. 171.)

There was expert testimony that "Made in U.S.A." claims have a significant positive impact on consumers and that Leatherman realized a "substantial advantage" by using a "Made in U.S.A." representation; however, the expert did not attempt to quantify either the dollar value of the consumer impact or the advantage realized by Leatherman. The record therefore contains *no* evidence concerning the amount of restitution necessary to restore purchasers to the status quo ante. Given the absence of any evidence to support the amount of restitution awarded, the trial court erred in granting its restitution order.[25]

---

[25] Because we reverse the trial court's restitution order as unsupported by substantial evidence, we need not address Leatherman's claim that its "Juice" line of tools should not have been included in the restitution order because those tools were not labeled with an unqualified "Made in U.S.A." designation.

## 2. *Injunctive Relief*

Leatherman objects to the trial court's order for injunctive relief requiring Leatherman to publish for 12 weeks in nine national magazines and 47 California newspapers notices of its deceptive labeling and advertising practices and the procedures for making a restitution claim. Leatherman argues that the order should be modified because Leatherman had voluntarily changed its labeling practices two years before trial and because compliance with the order will be unreasonably expensive. Leatherman offers as an alternative the publication procedures used when the parties provided notice of class certification: publication of notices twice in a 30-day period in newspapers throughout California. We review the trial court's order granting injunctive relief under the abuse of discretion standard. (*California Service Station etc. Assn. v. Union Oil Co.* (1991) 232 Cal.App.3d 44, 57 [283 Cal.Rptr. 279].)

"Injunctive relief is one of the principal remedies available for violations of §§ 17200 and 17500." (Stern, Bus. & Prof. C. § 17200 Practice (The Rutter Group 2005) ¶ 8:22, p. 8-6.) Section 17203 provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

Section 17535 provides in relevant part: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."[26]

---

[26] Sections 17203, 17204, and 17535 were amended by an initiative measure, Proposition 64, effective November 2, 2004, to limit standing in actions for injunctive relief to the Attorney General, any county district attorney, county counsel, or city attorney, and to "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." The issue of whether the amendments enacted by Proposition 64 apply retroactively is currently pending before the California Supreme Court. (See, e.g., *Benson v. Kwikset Corp.*, review granted

■ A trial court has broad authority to enjoin conduct that violates section 17200. (*Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543].) That authority is expansive but not unlimited. Although the unfair competition law imposes liability for past acts, in order to grant injunctive relief under section 17204 or section 17535, there must be a threat that the wrongful conduct will continue. "Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct." (*California Service Station etc. Assn. v. Union Oil Co., supra,* 232 Cal.App.3d at p. 57; see *Feitelberg v. Credit Suisse First Boston, LLC, supra,* 134 Cal.App.4th at p. 1012 [under § 17203, the " 'injunctive remedy should not be exercised "in the absence of any evidence that the acts are likely to be repeated in the future" ' "]; Stern, Bus. & Prof. C. § 17200 Practice, *supra,* ¶ 2:36, p. 2-10.[27]) Here, the trial court found that after the filing of this lawsuit and throughout the trial, Leatherman continued to represent on its tools, Web site, and advertising that the tools were "Made in U.S.A.," in violation of the false advertising and unfair competition laws. Leatherman's assertion that it had stopped making such representations "almost two years before trial" is contradicted by the evidence. Moreover, Leatherman has made no commitment to change its labeling practices on a permanent basis and has indicated that it may, in the future, resume labeling its products with an unqualified "Made in U.S.A." representation.[27]

Because we reverse the restitution award, some modification of the injunction is warranted to take into account that there is no need to give notice for the purpose of restitution. We remand the matter to the trial court to determine the appropriate scope of injunctive relief in view of this opinion and whether the mandatory injunction should be revised.

## C. *Attorney Fees*

Leatherman claims the attorney fees award should be reversed because the litigation conferred no significant benefit on the general public or a large class

Apr. 27, 2005, S132443.) We need not determine whether those amendments have retroactive effect in this case because Leatherman does not challenge plaintiffs' standing under the applicable statutes.

[27] The 1992 amendment to section 17203, which reads, "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined . . .", did not change the traditional grounds for injunctive relief. The purpose of this amendment was to expand the scope of section 17203 to include past acts so that discontinuance of those acts would not be a defense to liability. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) The amendment had no effect on the basis for the equitable remedy of injunctive relief. (Stern, Bus. & Prof. C. § 17200 Practice, *supra,* ¶ 2:36, p. 2-10; ¶ 5:235, pp. 5-65 to 5-66.)

of persons and because the $5.7 million fee award was excessive.[28] A trial court's decision to award attorney fees under Code of Civil Procedure section 1021.5 is reviewed under the abuse of discretion standard. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 578 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*).)

Code of Civil Procedure section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

■ Attorney fees may be awarded under Code of Civil Procedure section 1021.5 for consumer class action suits benefiting a large number of people. (*Graham, supra,* 34 Cal.4th at p. 578.) The statute "requires both a finding of a significant benefit conferred on a substantial number of people and a determination that the 'subject matter of the action implicated the public interest.' [Citation.]" (*Ibid.*) ■ Plaintiffs' lawsuits concerned the enforcement of the California consumer protection laws—an important right affecting the public interest. (*Lavie, supra,* 105 Cal.App.4th at p. 503 [evaluating whether an advertisement is deceptive under the unfair competition law "has important public policy implications for California consumers and businesses"].) The lawsuits also resulted in a significant benefit for a substantial number of people by causing Leatherman to change its labeling and advertising practices and by enjoining it from making future misleading representations.

The trial on the remedy involved the establishment of the restitution award that we reverse. A portion of the fees incurred in this case likely were attributable to the time and expense that concerned the restitution award. Accordingly, some modification of the attorney fees award is necessary. We therefore reverse the attorney fees award and remand the matter to the trial court to determine the appropriate amount of such award in light of this opinion. In determining the amount of attorney fees, the trial court should reduce the award by the amount attributable to the restitution award.

---

[28] Leatherman refers to Code of Civil Procedure section 1021.5 and not to the other ground asserted by plaintiffs—Civil Code section 1780, subdivision (d), which provides a prevailing party standard. The trial court made no distinction between these provisions in its order.

## III. DISPOSITION

The trial court's summary adjudication of liability under the false advertising law, the unfair competition law, and the CLRA is affirmed. The restitution award is reversed. The order granting mandatory injunctive relief is reversed, and the matter remanded to the trial court to determine the appropriate scope of the mandatory injunction in view of this opinion. The attorney fees award is reversed and remanded for the trial court to determine the appropriate amount of such award in view of this opinion. Plaintiffs are awarded their costs on appeal.

Turner, P. J., and Kriegler, J., concurred.

A petition for a rehearing was denied January 31, 2006, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied March 29, 2006, S141185.

705

APPENDIX

# The
# LEATHERMAN
# STORY

In 1975, Tim Leatherman was on a "low budget" trip through Europe. He spotted up with his standard "Scout" knife. It was not much he could on an old hotel plumbing and his unreliable car. What he really needed was a compact pocket knife with full-sized pliers, but no such tool existed. It took Tim the next eight years to design and produce the original LEATHERMAN® Tool.

Today, LEATHERMAN® remains the leader in the multi-purpose tool industry. All too sure are manufactured in the U.S.A. with uncompromising quality from 100% stainless steel and backed by a 25-year warranty.

### POCKET SURVIVAL TOOL™
This is the original LEATHERMAN® Tool

NEEDLENOSE PLIERS / REGULAR PLIERS / HARD WIRE CUTTERS / KNIFE / FILE / RULER / CAP-BOTTLE OPENER / 3 FLAT SCREWDRIVERS / PHILLIPS SCREWDRIVER / AWL / CLIP

### PST II™
The PST II™ has the most popular features of the original LEATHERMAN® and more.

NEEDLENOSE PLIERS / HARD WIRE CUTTERS / SERRATED KNIFE / SCISSORS / 3 FLAT SCREWDRIVERS / CAP-BOTTLE OPENER / 3 FLAT SCREWDRIVERS / PHILLIPS SCREWDRIVER

### SUPER TOOL™
With 10 locking blades and its total features, the Super Tool™ is the ultimate in compact tools.

NEEDLENOSE PLIERS / REGULAR PLIERS / HARD WIRE CUTTERS / WIRE CUTTERS / STRIPPING KNIFE / SERRATED KNIFE / WOOD-BONE SAW / FILE / RULER / CAP-BOTTLE OPENER / AWL / LARGE SCREWDRIVER / FIXED AD SCREWDRIVERS / PHILLIPS SCREWDRIVER / CLIPING, SIDELINE / WIRE CUTTER / AWL, CLIP

### MINI-TOOL™
The Mini Tool is the world's smallest full size pliers.

NEEDLENOSE PLIERS / REGULAR PLIERS / HARD WIRE CUTTERS / MEDIUM PLIERS / KNIFE / FILE / CAP-BOTTLE OPENER / 3 FLAT SCREWDRIVER / MEDIUM PHILLIPS SCREWDRIVER

### MICRA™
The best possible precision in a tiny package.

SCISSORS IN EXTENDED / KNIFE / NAIL FILE CLEANER / TWEEZER / SMALL SCREWDRIVER / MEDIUM SCREWDRIVER / FLAT PHILLIPS SCREWDRIVER / BOTTLE OPENER / LANYARD ATTACHMENT

### TOOL ADAPTER™
The latest invention from LEATHERMAN® comes to your Pocket Survival Tool,™ PST II™ or Super Tool.™ A 1/4" hex drive that locks in three positions! Comes with a sleeve and o hex bits.