In re M3 POWER RAZOR SYSTEM
MARKETING & SALES PRAC-
TICE LITIGATION.

This Document Relates to: All Actions.

Civil Action No. 05–11177–DPW.
MDL Docket No. 1704.

United States District Court,
D. Massachusetts.

Aug. 6, 2010.

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, District Judge.

This consolidated consumer litigation alleges misrepresentation by the defendant Gillette Company in the marketing of shaving devices. A motion seeking preliminary review[1] and authorization of notice re-

**1.** The motion sought "preliminary approval" of the settlement. I have declined to adopt the

"approval" nomenclature in order to emphasize, as a recent project of the American Law Institute

garding a North American class[2] action settlement raised the challenging question whether and, if so, how class action certification should be made when the governing substantive law is drawn from various North American jurisdictions. Last week, on July 30, 2010, I allowed that motion in substance through an "Order Authorizing Notice of Class Settlement and Notice of Final Fairness Hearing." This Memorandum provides a more extended narrative of reasons for doing so.

Only a California plaintiff in one of the consolidated actions, *Corrales v. Gillette Co.*, Civil Action No. 05–12332–DPW, submitted objections. As discussed more fully below, I did not find those objections concerning California law compelling.[3] Nevertheless, after preliminary *sua sponte* consideration of the law of the other jurisdictions, I required additional submissions before authorizing the publication of notice of settlement. The proponents of the settlement submitted an extensive analysis of the relevant variations in the governing law to provide a basis sufficient to demonstrate that: (1) questions of law and fact common to the class members predominate; (2) the class representatives align generally with the class as a whole and its constituent parts; (3) there is no unfair-

ness in treating similarly class settlement members drawn from multiple jurisdictions with diverse legal regimes; and (4) the settlement resolution is adequate.

The proponents of the settlement submitted a detailed compendium of the applicable law in the several jurisdictions from which class members are drawn and the parties further briefed the issues. More recently, the proponents of the settlement amended the settlement agreement to incorporate developments in Gillette's shaving device products and to update accordingly the terms of the settlement agreement to be offered the settlement class. *In re M3Power Sys. Mktg. & Sales Practices Litig.*, Civil Action No. 05–11177–DPW (D.Mass. Apr.26, 2010) (No. 147–2). No separate objection has been asserted as to the amended settlement.

■ Ultimately, I have been satisfied that where, as here, all the plaintiffs "share[ ] a single, common claim that g[ives] rise to an identical right to recovery under a single state statute for every member of the class," class certification is appropriate in the absence of "variations in state laws … so significant as to defeat commonality and predominance, even in a settlement class." *Sullivan v. DB Invs., Inc.*, 613 F.3d 134, 153–54 n. 15 (3d Cir.2010) (citing *In re Warfarin*

has counseled, that the decision to permit class notice is not approval of the settlement. *See generally* PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.03, cmt. a (2010) (discussing preliminary review process). Approval must await "definitive review at the time of the fairness hearing," following notice and an opportunity for any objections. *Id.*

2. The settlement class includes not only consumers throughout the United States but also includes Canadian consumers.

3. I note that counsel for this California plaintiff, who were unsuccessful in their own efforts to become lead counsel in this Multidistrict Litigation matter, earlier attempted to open another front in their battle to avoid consolidated treatment of the litigation. In *Adoure v. Gillette Co.*, No. 05–11177–DPW, which was also consolidated before me as a result of assignment by the Judicial Panel for Multidistrict Litigation, the same counsel sought remand to the California state courts. After I denied remand, counsel for plaintiff in *Adoure* appealed under 28 U.S.C. § 1453(c)(1), the review provisions of the Class Action Fairness Act of 2005. The First Circuit

rejected that appeal noting that "Adoure has consistently argued, both in the district court and in this court, that this action is not a class action." *Adoure v. Gillette Co.*, No. 06–8005 (1st Cir. Apr. 24, 2006).

Thereafter, counsel in *Adoure* sought to obtain immediate appellate review of the otherwise interlocutory appeal of the denial of the remand request, through a protocol the First Circuit has adopted, by moving for voluntary dismissal. *See generally In re M3Power Razor Sys. Mktg. & Sales Practices Litig.*, 2007 WL 128846, at *1–2 (D.Mass. Jan. 11, 2007). I permitted dismissal on this procedural basis, nevertheless finding "as a substantive matter [Adoure's] continuing objections to the denial to remand this action to state court to be without merit." *Id.* at *5; *see generally* * *2–5.

A month later, counsel for *Adoure* abandoned that appeal. *In re M3Power Razor Sys. Mktg. & Sales Practices Litig.*, Civil Action No. 05–11177–DPW (D.Mass. Feb.12, 2007) (No. 120) ("Notice of Plaintiff Kasem Adoure's Election To Not Pursue An Appeal of the Dismissal of his Action"), thereby closing that separate front in counsel's efforts to contest consolidated treatment of the MDL Litigation.

*Sodium Antitrust Litig.,* 391 F.3d 516, 529–30 (3d Cir.2004)). Finding no significant variations in other state laws sufficient to defeat the commonality and predominance evident in this case, where all class members have advanced a claim under the Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A, "on the ground that the allegedly deceptive communications originated from [Gillette's Massachusetts-based] headquarters," *Sullivan,* 613 F.3d at 153–54 n. 15, I certified a single settlement class and authorized publication of the class notice.

## I. BACKGROUND

This consolidated consumer class action case was assigned to me for pretrial proceedings as the result of an Order of the Judicial Panel for Multidistrict Litigation ("JPMDL"), which transferred a number of related cases to this District, where I previously had been assigned similarly related Massachusetts cases. The cases all arise out of Gillette's advertising and marketing for its M3P razor system.

### A. Factual Background

Gillette, a Massachusetts-based shaving and cosmetic manufacturer, launched the M3P razor in North America on May 24, 2004. The M3P is a razor system consisting of a permanent razor handle and separate refillable blades. The major change between previous products and the M3P was the addition of a battery-operated oscillating head. Gillette claimed in various advertisements that the M3P creates micro-pulses that raise hair away from the skin and enable the user to shave more closely and easily. Gillette advertised the M3P battery-powered oscillating head as "revolutionary" in its ability to raise hair up and away from the skin. The disputed claims appeared on Gillette's website, on retail packages, in print advertisements, and in television commercials. Plaintiffs allege that the advertising claims were deceptive and materially misleading because Gillette was aware that the M3P did not actually raise facial hair "up and away" from the skin. All of the Representative Plaintiffs [4] claim to have based a decision to purchase the razor on the misleading M3P advertising campaign.

### B. Procedural History

Within several months of the M3P launch, Gillette's primary competitor in the worldwide wet-shave razor market, Schick Manufacturing, Inc. ("Schick"), filed lawsuits in various countries around the world, accusing Gillette of false advertising. Courts in France, Belgium, and the Netherlands declined to enjoin the disputed advertising, but courts in Germany and Australia issued preliminary injunctions doing so.

On January 28, 2005, Schick filed suit in the United States District Court for the District of Connecticut, alleging Lanham Act violations and seeking a preliminary injunction against the disputed advertising. *Schick Mfg., Inc. v. Gillette Co.,* No. 05–00174–JCH (D.Conn. Jan. 28, 2005). After expedited discovery and a hearing, Judge Hall issued a preliminary injunction on May 31, 2005. *Schick Mfg., Inc. v. Gillette Co.,* 372 F.Supp.2d 273 (D.Conn.2005). Gillette and Schick then engaged in extensive discovery, with Gillette producing more than 100,000 pages of documents relating to liability and damages, before reaching a worldwide settlement agreement in early 2006. Pursuant to the settlement agreement, all related litigation between the two parties was dismissed.

Following the issuance of the preliminary injunction in the District of Connecticut, plaintiffs filed consumer class actions based on the same underlying facts in several United States and Canadian jurisdictions. All actions filed in state courts in the United States were removed to federal court, and all the federal cases in other districts were transferred by the JPMDL to this Court. I consolidated the cases and resolved contentious disputes among the several plaintiffs' counsel regarding the appointment of Co–Lead and Liaison counsel.

---

**4.** The "Representative Plaintiffs" (and their jurisdictions of residence) are Mark Dearman (Florida), Anthony DeBiseglia (New York), Matthew Marr (California), Adam Kline (Massachusetts), Greg Besinger (Illinois), Collin L. McGeary (Massachusetts), Javier Tunon (Georgia), and Jean–Sebastien Elie (Canada).

The parties thereafter commenced formal discovery, with Gillette producing all of the documents it had previously produced to Schick, along with hearing transcripts and exhibits from the District of Connecticut proceeding. Under my case management order of March 17, 2006, Co–Lead Counsel were authorized to conduct settlement negotiations on behalf of plaintiffs in all of the consolidated cases. After reporting imminent settlement during that summer, the parties executed a Settlement Agreement, and I conducted a hearing to consider the proposed settlement. The Representative Plaintiffs and Gillette supported publication of notice and class certification for the purposes of settlement, but California Plaintiff Carlos Corrales objected to both. Because Corrales objected that he had not had adequate time to respond to the Motion for preliminary approval, I permitted additional briefing by all parties and conducted a second hearing to consider the matter further. Once again, the Representative Plaintiffs and Gillette supported the proposed settlement, and Corrales opposed it.

As I worked my way through the drafting process for a Memorandum regarding the settlement approval motion, I was inclined to authorize notice of what I found to be a "settlement [that] makes eminent good sense," as I observed to the parties during a 2008 status conference. Apr. 28, 2008 Tr. at 4:12–13. Nevertheless, as I also explained to counsel at that hearing, I felt obligated to survey the relevant law on a jurisdiction-by-jurisdiction basis to determine whether material differences, as applied to the proposed settlement, might yield unfair and disproportionate advantages or disadvantages for class members from certain jurisdictions. The proponents responded by submitting a "Joint Submission by the Proponents of the Proposed Settlement Comparing the Relevant Laws of the Applicable Jurisdictions for Settlement Class Certification." (Dkt. No. 135.) The proponents and the California plaintiff objector separately briefed the issues.

In April of this year, in order to account for developments in Gillette shaving products relevant to settlement, the proponents submitted a "Joint Motion to Amend the Proposed Settlement and for Preliminary Approval of Amended Settlement Agreement." (Dkt. No. 147.) No separate objection was submitted as to the Joint Motion to Amend.

Following the issuance of the Third Circuit's opinion in *Sullivan* on July 13, 2010, I entered a Procedural Order on July 16, 2010, notifying the parties of my intention to authorize notice regarding the proposed settlement on July 30, 2010, and requesting the parties to consult among themselves regarding a precise date for a final fairness hearing; I also solicited revised forms of orders and related documents to further that intention. The proponents complied and, with the promise that a forthcoming Memorandum of reasons for authorizing notice would issue this week, I entered the "Order Authorizing Notice of Class Settlement and Notice of Final Fairness Hearing" on July 30, 2010. (Dkt. No. 149.) This is that promised Memorandum.

## II. THE PROPOSED SETTLEMENT

### A. Settlement Terms

The revised proposed Settlement Agreement as Amended obligates Gillette to establish a Settlement Fund of $7.5 million for the distribution of cash and other benefits to class members. Up to $2.45 million of the Settlement Fund is available to provide notice to potential class members. Any notice costs over this amount, including the potential costs of providing additional notice if the settlement is not approved at the Final Fairness Hearing, will be borne solely by Gillette.

### B. Initial Claim Period

During an Initial Claim Period (beginning six months from the date of the first publication of notice of the Final Fairness Hearing), a class member who wishes to participate in the settlement has one, and only one, of two options: a refund or a rebate.

If a class member opts for a refund, he or she must return the M3P razor (but not the blade(s) or batteries) and certify that it was purchased or otherwise acquired during the class period. In exchange, the class member will receive a check for $13, plus $2 for postage and handling, for a total of $15.

Canadian consumers will receive the approximate Canadian equivalent, or $16.25 Canadian dollars, plus the Canadian dollar equivalent of $2 for postage and handling. If a class member paid more than $13 (or the Canadian equivalent) for the M3P razor and has adequate documentation of the actual price paid, this documentation may be submitted along with the razor to obtain a refund of the full purchase price, plus $2 for postage and handling.

If a class member opts to keep the M3P razor, or has already disposed of it, he or she can obtain up to two $5 rebates[5] for any purchase of M3P blades (purchased after May 1, 2004), and/or a Gillette Fusion razor or a Fusion ProGlide razor (manual or battery powered) (purchased after January 1, 2006) through the end of the Initial Claim Period. To receive the rebate, a class member must submit either (1) the UPC code from the package of M3P blades, the Fusion razor, or the Fusion ProGlide razor, or (2) a receipt showing the relevant purchase, along with a certification that an M3P razor was purchased or obtained during the relevant time period, and no prior claim has been made for a refund or replacement razor.

If the refunds and rebates claimed in the Initial Claim Period exceed the allocated Settlement Fund, each class member will receive a *pro rata* share of the settlement.

### C. Distribution After Initial Claim Period

If the Settlement Fund is not exhausted at the end of the Initial Claim Period, the excess amount will be allocated as follows:

First, Gillette will mail a new Fusion manual razor or, by agreement between Gillette and Settlement Class Counsel, a new Fusion ProGlide manual razor ("Settlement Razor") to each class member who submitted an approved claim for a rebate or refund during the Initial Claim Period.[6] For each Settlement Razor, Gillette will receive a $7 credit against the Settlement Fund. If the Settle-

ment Fund would be exhausted before each prior claimant receives a Fusion razor, a statistically random sample of prior claimants will receive a razor until the balance is exhausted.

Next, if Settlement Razors are sent to all prior claimants and the Settlement Fund is still not exhausted, Gillette will place a link on the M3P razor webpage inviting class members who have not previously submitted a claim to do so. After certifying that he or she purchased or otherwise obtained an M3P razor during the class period, and that this is the first claim submitted under the settlement, the class member will receive a free Fusion ProGlide manual razor, and the Settlement Fund will be debited $7. This option will remain available for ninety days or until all funds are distributed, whichever comes first.

If money still remains in the Settlement Fund after the ninety-day claim period has ended, Gillette will distribute free Fusion ProGlide manual razors to a group selected by the parties, in proportion to the populations of the various states and Canada, until the Settlement Fund is fully depleted.

The proposed Settlement Agreement contains no reverter clause, and the full $7.5 million, including up to $2.45 million for notice, will be distributed for the benefit of class members. Potential class members have the right to opt out, if written notice is postmarked at least 21 days prior to the date of the Final Fairness Hearing. In addition to the $7.5 million Settlement Fund, Gillette has agreed to pay up to $1,850,000, subject to Court approval, for attorneys' fees, costs, and expenses, as well as incentive awards to the Representative and named Plaintiffs in amounts of $500 (or the prevailing Canadian dollar equivalent) to $1,000 each.

### III. CLASS CERTIFICATION

 Federal Rule of Civil Procedure 23 governs class certification in the federal

---

5. Canadian consumers will receive the equivalent of $5 in Canadian dollars.

6. Any Settlement Razor distributed will also include a $4 coupon for Gillette shaving products,

the value of which coupon is not debited against the Settlement Fund and is not used in calculating attorneys' fees, costs, or expenses.

courts. Before certifying a class, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23...." *Smilow v. S.W. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir.2003) (citing *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). To obtain class certification, plaintiffs must establish each of the four elements of Rule 23(a)— numerosity, commonality, typicality, and adequacy of representation—and one of the elements in Rule 23(b). *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). The fact that class certification is requested only for the purpose of settlement is no barrier to certification. *Amchem*, 521 U.S. at 619, 117 S.Ct. 2231. However, considerations stemming from structural concerns about potential collusion and reverse auctions in settlement class actions make it "incumbent on the district court to give heightened scrutiny to the requirements of Rule 23 in order to protect absent class members." *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 88 (D.Mass.2005) (citing *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231).

## A. Rule 23(a)

■ Rule 23(a) imposes four prerequisites to class certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The plaintiffs must demonstrate that each Rule 23(a) requirement is satisfied for class certification to be appropriate. *Smilow*, 323 F.3d at 38.

### 1. Numerosity

■ The numerosity requirement is easily satisfied in this case because Gillette sold over ten million M3P razors across the United States and Canada in the pertinent time periods. No purchaser records were maintained, so there is no possibility of locating, much less joining individually as plaintiffs, all of the potential class members.[7] Given the large number of potential class members, and the relatively small claim each one has for damages, individual lawsuits are clearly impracticable, and Rule 23(a)(1) is satisfied.

### 2. Commonality

■ The threshold for commonality under Rule 23(a)(2) is not high. *Lupron*, 228 F.R.D. at 88 (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)). Because the Rule 23(a)(2) analysis is "[a]imed in part at 'determining whether there is a need for combined treatment and a benefit to be derived therefrom,' the rule requires only that resolution of the common questions affect all or a substantial number of the class members." *Id.* (quoting *Jenkins*, 782 F.2d at 472).

■ Although variations existed in the legal requirements of various state law claims and in the facts necessary to prove such claims, it is beyond dispute that common core questions lie at the heart of this litigation. Stated in their highest degree of generalities, these include: whether Gillette misrepresented the capabilities of the M3P razor to the potential class, whether the potential class members sustained ascertainable damages from such conduct, and, if so, in what amount. These common issues of fact and law are sufficient to meet the threshold of Rule 23(a)(2), and indicate that class certification could be beneficial to the expeditious resolution of this dispute.

### 3. Typicality

■ To establish typicality, the plaintiffs need only demonstrate that "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.* at 89 (quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220

---

7. The Settlement Class is defined as "all Persons in the United States of America or Canada who purchased or otherwise acquired for use and not resale an M3Power Razor in the United States during the period May 1, 2004 through September 30, 2005, or in Canada during the period May 1, 2004 through October 31, 2005."

F.R.D. 672, 686 (S.D.Fla.2004)). Here, it is clear that the claims of the Representative Plaintiffs are based on the same event (purchase of an M3P razor based on misleading advertisements) as the potential class members. The legal theories of recovery for the Representative Plaintiffs are typical of those of the class as a whole. As reflected in the Amended Consolidated Class Action Complaint, most counts are based on common law causes of action (negligent misrepresentation, intentional misrepresentation, breach of express warranty, breach of implied warranty of fitness of purpose, and unjust enrichment), which will be substantially uniform across the class. The Amended Complaint also alleges violation of various state consumer protection statutes. Although the Representative Plaintiffs are not residents of each of the covered states, the consumer protection statutes in the states in which they reside (Florida, New York, California, Massachusetts, Illinois, Georgia and Canada) appear to be typical of, and generally even more consumer-friendly than, consumer protection laws in the range of jurisdictions that they represent. Consequently, the Representative Plaintiffs satisfy the typicality requirement of Rule 23(a)(3).

### 4. Adequate Representation

Rule 23(a)(4) requires that the proposed class representatives "fairly and adequately protect the interests of the class." This requirement has two parts. The plaintiffs "must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985).

As to the former, the Representative Plaintiffs' interests generally align with the class as a whole, because all parties, named and unnamed, are seeking redress from what is essentially the same injury, the purchase of an M3P razor based on misleading advertisements. Indeed, all members of the class share a claim under Chapter 93A of the Massachusetts General Laws. Although some variations exist between potential remedies, depending on the state of residence, these differences do not create the type of intra-class conflicts that often appear in the mass tort context. *See generally* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343 (1995). The problem of differing remedies will be discussed in greater detail below. At this point, it is sufficient to note that the interests of the Representative Plaintiffs and the absent class members are not generally in conflict, and that counsel is adequate.

The latter requirement relating to counsels' qualifications was established early in the case and has continued to be satisfied as this case proceeds. After considering disputes among plaintiffs' counsel regarding the appropriate appointments, I appointed—over the objection of the California plaintiff's counsel who were not appointed—Co–Lead and Liaison counsel that I found qualified and experienced, and I have no reason to think the appointed counsel have not been performing competently; to the contrary, the record shows that they have been. Indeed, I find on the basis of the record before me that appointed counsel have performed in a highly competent and professional manner. Therefore, representation is fair and adequate, as required by Rule 23(a)(4).

### B. Rule 23(b)

In addition to satisfying the four elements of Rule 23(a), plaintiffs must demonstrate that at least one subsection of Rule 23(b) applies. I find Rule 23(b)(3) directly applicable, as this subsection allows for class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). In short, plaintiffs must demonstrate predominance and superiority.

### 1. Predominance

The predominance inquiry overlaps with the commonality requirement of Rule 23(a)(2), but is more demanding. "The

Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231. The pertinent legal and factual questions are those that "qualify each class member's case as a genuine controversy," but do not include the fairness or desirability of the proposed settlement in a settlement class action. *Id.* The predominance standard can be met even if some individual issues arise in the course of litigation, because "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." *Smilow*, 323 F.3d at 39. In this connection, some types of cases are uniquely well-suited to class adjudication, and "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231.

▮ In this case, it is clear that the issues common to the class predominate over those that are personal to individual class members. The dominant common questions include whether Gillette's advertising was false or misleading, whether the company's conduct violated the statutory and/or common law causes of action delineated in the Amended Complaint, and whether the class members suffered damages as a result of this conduct. Even if state consumer statutes or other state causes of action differ in arguably material ways, common questions, not individual issues, predominate among and within each state's legal regimes. Indeed, Chapter 93A of the Massachusetts General Laws provides a cause of action common to all class members against the defendant. In order to develop these findings and conclusions further and recognizing that subclasses might be used to accommodate differences in state law or relative advantage or disadvantage among legal regimes, I will address the problem of differences in legal theories in Section III.B.3, *infra.* For now, I note my finding that the predominance requirement of Rule 23(b)(3) appears to be satisfied.

### 2. Superiority

▮ Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Courts must consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* The predominance and superiority requirements are inherently interrelated, and were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231 (quoting FED. R. CIV. P. 23 advisory committee's notes (1966)). "Rule 23 has to be read to authorize class action in some set of cases where seriatim litigation would promise such modest recoveries as to be economically impracticable." *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 66–67 (1st Cir.2010).

▮ In this case, involving millions of potential plaintiffs with small individual claims, a class action is the only feasible mechanism for resolving the dispute efficiently. Absent class certification, it is highly unlikely that any individual aggrieved consumer will seek or obtain redress, because the transaction costs of filing and prosecuting a lawsuit individually far exceed the recoverable individual damages, even under the most generous state consumer protection statutes. In short, in the absence of class certification, there would be nothing for an individual class member to control because a separate action would not be prosecuted. There is no other litigation not consolidated in this forum through which class members can pursue the controversy. The forum jurisdiction is familiar with Chapter 93A, the Massachusetts consumer protection statute, available to all plaintiffs challenging alleged misrepresentations made during a North American marketing campaign by a Massachusetts corporate defendant. Under the circumstances, a class

action pursued on a consolidated basis in the District of Massachusetts is superior to any other mechanism for adjudicating the case, and Rule 23(b)(3) is satisfied.

### C. Subclassing

Objecting Plaintiff Corrales opposes certification of the class and authorizing notice of the settlement on the ground that the proposed settlement is insufficiently generous to potential California class members. Corrales argues that the consumer protection statutes in the state of California are so favorable to California consumers, particularly in terms of available remedies, that they should be treated differently from class members of other states. Assuming for the moment that Corrales' objections are valid, one potential mechanism for dealing with differential state remedies is to certify subclasses within the larger class. But this decision must not be made lightly because it inherently reduces the efficiency of the class action mechanism and increases transaction costs (particularly for notice).

Close analysis of a California subclass is a useful means to approach the problems presented by differences in legal theories among the several jurisdictions whose case law is involved by the consolidated complaint. I will consider three related questions to determine whether a California subclass is appropriate. First, what is the significance of variations in state law for purposes of certifying a nationwide class? Second, what is the content of California consumer protection law, and how does it compare to the common claim presented by Mass. Gen. Laws ch. 93A or otherwise differ from laws of other jurisdictions? Third, do any differences rise to a level that would necessitate the certification of a subclass? I will then address the problems more generally to determine what level of additional analysis is necessary given the common factual and legal issues shared by the plaintiff class members.

#### 1. Variations in State Law

When nationwide class actions are based on state law claims, variations in state law create several potential challenges for certification under Rule 23, quite apart from the

trial management issues that illustrate the challenges. State law differences signify "diverse legal standards and a related need for multiple [legal determinations]," and sometimes "multiply the individualized factual determinations" that a court must undertake. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 726 (5th Cir.2007). Legal variations also undermine the class's ability to satisfy the commonality requirement of Rule 23(a)(2). *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 742–43 n. 15 (5th Cir.1996). A related problem raised by state law variations is tension among the plaintiffs: conflicts of interest and allocation dilemmas can become evident and disabling during settlement or judgment. The Supreme Court has made it clear that before certifying a class—even in the settlement context—a court must closely examine potential conflicts of interest, as well as inequality in the strength of claims. *Amchem*, 521 U.S. at 625–26, 117 S.Ct. 2231.

Circuits have required a rigorous analysis of state law variation must precede class certification. *See, e.g., Cole*, 484 F.3d at 724 ("The party seeking [class] certification ... must ... provide 'an extensive analysis' of state law variations to reveal whether these pose 'insuperable obstacles.'") (internal quotation marks and citations omitted); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir.2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *Castano*, 84 F.3d at 743 n. 15 ("We find it difficult to fathom how common issues could predominate in this case when variations in state law are thoroughly considered."). The First Circuit has been no less diligent in urging a "rigorous analysis" of the relation between merits claims and the requirements of Rule 23. *See generally In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir.2008). Courts must remain sensitive, however, to the "common core" of issues among plaintiffs, even if coupled with "disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998).

One solution to the problems of state law variation in a nationwide class is to cre-

ate a subclass of plaintiffs—a group of claimants from a state (or states) whose legal remedies differ substantially from those of other states. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir.2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). Certification of subclasses, however, must continue to facilitate the operation of the class action. *Id.* (warning that a court "must be careful not to certify too many groups," otherwise instructing the jury on— or otherwise applying—the relevant law would be an "impossible task").

### 2. Consumer Protection Law as a Basis for Subclassing

■ Although the Consolidated Amended Complaint presents a multiplicity of causes of action (Negligent Misrepresentation, Intentional Misrepresentation, Express Warranty, Implied Warranty, Unjust Enrichment and Unfair Practices and Consumer Protection Statutes) from a multiplicity of North American jurisdictions, analysis of the relevant questions regarding class certification can be focused by discussion of the California Consumer Protection provisions relied upon by the California plaintiff objector and the Massachusetts claim under Chapter 93A common to all class members.

### a. California

The relevant portions of California's consumer protection law for this case are found in three statutes: the Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*, the False Advertising Law ("FAL"), *id.* at § 17500 *et seq.*, and the Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.* A California state appellate court decision has helpfully catalogued the remedies available under each statute. *Colgan v. Leatherman Tool Group,*

*Inc.*, 135 Cal.App.4th 663, 38 Cal.Rptr.3d 36 (2006).

From the remedial perspective, all three statutes authorize injunctive relief, *id.* at 44–45, as well as restitution. *Id.* at 58 ("There is nothing to suggest that the restitution remedy provided under the CLRA should be treated differently than the restitution remedies provided under the False Advertising or Unfair Competition Laws."). Damages, however, are available only under the CLRA, and not under the UCL or FAL. *Id.* at 43 n. 7, 59 ("Damages under the CLRA are a legal remedy, intended to compensate those who suffer actual damage. Damages are not available under the False Advertising and Unfair Competition Laws because restitution is the only available remedy under those statutes." (internal citation omitted)).

■ As a policy matter, the goal of the California consumer protection statutes is to return ill-gotten gains to consumers, with a secondary purpose of deterring future violations. *Id.* at 59–61. The restitutionary remedy is not "intended as a punitive provision, though it may fortuitously have that sting when properly applied to restore a victim to wholeness." *Id.* at 61. Before a court may award restitution, the appropriate amount of restitution must be shown by "substantial evidence." *Id.* at 63.

In *Colgan,* a California Court of Appeals reversed a lower court decision to award $13,012,255.50 in total restitution under the FAL, UCL, and CLRA, finding that the restitution order was not supported by sufficient evidence.[8] *Id.* at 66. The plaintiffs presented evidence regarding the market value and retail price of the Leatherman tools at issue, and the market price of similar tools made in China. *Id.* at 42. The trial court refused to consider this evidence, however, finding it unreliable. *Id.* at 43–44. The trial court also refused to consider Leatherman's gross profits on the items as a measure of damages, rejecting this approach as "inequitable"; be-

---

**8.** In stark contrast to the substantial $13,012,255.50 restitution award, the trial court awarded only the $1,000 statutory minimum for damages under CLRA because the court was unable to determine actual damages with sufficient certainty. *Colgan v. Leatherman Tool*

*Group, Inc.*, 135 Cal.App.4th 663, 38 Cal.Rptr.3d 36, 43 (2006) ("The trial court stated: 'If this Court were able to determine actual damages, this Court would have awarded more than $1,000. How much more, the Court does not know.' ").

cause "although the purchasers did not receive entirely what they bargained for ... these Class members did benefit from the quality, usefulness, and safety of these multipurpose tools," and it would be unfair to return to them the entire purchase price. *Id.* at 44. Expert testimony was introduced on the advantages Leatherman obtained through false advertising, but the Court of Appeals rejected this testimony as a basis for a damage calculation, finding that "the expert did not attempt to quantify either the dollar value of the consumer impact or the advantage realized by Leatherman." *Id.* at 63.

As *Colgan* demonstrates, the evidentiary standard for awarding restitution and actual damages is demanding in California state courts. The case before me has similar valuation difficulties because Gillette has adduced evidence that consumers preferred the M3P razor, even if it did not perform exactly as advertised. The precise value of having one's hair raised "up and away" during a shave is inherently speculative. In this setting, it is not likely that a court applying California law in a California state class action would award restitution. The probability of a large monetary award in the form of restitution or actual damages is by no means the legal certainty Corrales suggests.

The CLRA also allows for punitive damages. Yet, the plaintiffs in *Colgan* did not pursue this remedy at trial, despite having a case strong enough to be decided in their favor on summary adjudication. *Id.* at 42 n. 6. If California plaintiffs with such a clear-cut liability case determined that punitive damages were not worth pursuing, it seems highly unlikely that a court applying California law would award such damages in the instant case, where courts around the world divided, at least on an interlocutory basis, over whether Gillette's conduct was even actionable.

It bears emphasizing that after a 2004 referendum, California's procedural and substantive consumer protection law became less consumer-friendly than it once may have been perceived to be. Proposition 64, passed by California voters on November 2, 2004 and effective as of the next day, altered the UCL (a) to remove the private attorney general provision that allowed for representative non-class actions and (b) to add an injury-in-fact requirement for standing. 2004 Cal. Legis. Serv. Prop. 64 (West). Among other things, Proposition 64 altered Section 17203 of the California Business and Professions Code so that "[a]ny person may pursue representative claims or relief on behalf of others *only* if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure...." (emphasis added). Section 17204 limits standing to a plaintiff "who has suffered injury in fact and has lost money or property as a result of the unfair competition," and Section 382 is the California class action statute.

In the initial wake of Proposition 64, California consumer protection law was unsettled, particularly in the class action context. Courts expressed confusion as to whether the class as a whole, or only the class representative, needed to show injury in fact and reliance. *See, e.g., Pfizer Inc. v. Superior Court,* 45 Cal.Rptr.3d 840, 844 (Cal.App.Ct.2006), *superceded by* 51 Cal.Rptr.3d 707, 146 P.3d 1250 (Cal.2006), *and cause transferred by* 99 Cal.Rptr.3d 559, 215 P.3d 1061 (Cal.2009) (transferring case with directions to vacate its decision and to reconsider in light of *In re Tobacco II,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009)).

The impact of Proposition 64 on UCL class actions has recently been clarified by the California Supreme Court, which has held the initiative imposed a procedural standing requirement on the class representative, but did not enlarge "the substantive rights [or] the remedies of the class." *In re Tobacco II,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 38 (2009). Put simply, the court found that "[n]othing a business might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted." *Id.,* 93 Cal.Rptr.3d 559, 207 P.3d at 30 (quoting *Californians for Disability Rights v. Mervyn's, LLC,* 39 Cal.4th 223, 46 Cal. Rptr.3d 57, 138 P.3d 207, 212 (2006)). The standing requirements in Proposition 64 were deemed applicable only to the class representatives, not all unnamed class mem-

bers. *Id.*, 93 Cal.Rptr.3d 559, 207 P.3d at 25. As for the causation requirement for purposes of establishing standing, *Tobacco II* concluded that *"a class representative proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements,"* but is not required "to plead or prove an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements when the unfair practice is a fraudulent advertising campaign." *Id.*, 93 Cal.Rptr.3d 559, 207 P.3d at 25–26 (emphasis added). This framework has provided clarity for lower courts in shaping the parameters of class action suits under California law.[9]

### b. Massachusetts

■■■ The protections for consumers provided by the Massachusetts Unfair and Deceptive Business Practices Act, MASS. GEN. LAWS ch. 93A, § 9, are quite robust and arguably more consumer friendly than the California consumer protection regime. Unlike the California UCL cause of action, Chapter 93A does not require reliance, rather the applicable standard for determining whether an act is "deceptive" is whether "it possesses 'a tendency to deceive.'" *Leardi v. Brown*, 394 Mass. 151, 474 N.E.2d 1094, 1099 (1985) (citation omitted). The Massachusetts Supreme Judicial Court has emphasized that "[u]nlike a traditional common law action for fraud, consumers suing under c. 93A need not prove actual reliance on a false representation...." *Dalis v. Buyer Adver., Inc.*, 418 Mass. 220, 636 N.E.2d 212, 216 (1994) (citing *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 322 N.E.2d 768, 779 (1975)). Materiality and causation are established by

a showing that the deceptive representation "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 407 N.E.2d 297, 307 (1980) (citation omitted).

■■■ The consumer may recover compensatory damages under Chapter 93A for misrepresentation whether the misrepresentation is intentional, *GTE Prods. Corp. v. Broadway Elec. Supply Co.*, 42 Mass.App.Ct. 293, 676 N.E.2d 1151, 1154 (1997) ("benefit of the bargain"), or unintentional, *Anzalone v. Strand*, 14 Mass.App.Ct. 45, 436 N.E.2d 960, 962 (1982) ("out of pocket" and reliance damages). While punitive damages are not available as such, exemplary multiple damages are available up to three times actual damages but not less than two times actual damages (or $25, whichever is greater). MASS. GEN. LAWS ch. 93A, § 9(3). In addition, equitable remedies such as injunctions or rescission can be used by the courts to remedy wrongs under Chapter 93A. *Id.* While restitution as a remedy is reserved to actions by the Attorney General under § 4 of Chapter 93A, in the class setting, it bears emphasizing that the aggregate of actual damages afforded by a Chapter 93A consumer class action claim necessarily parallels the restitutionary remedy.

### c. Other Jurisdictions

After extended review of the various legal regimes, I find without reciting the details with particularity, that the Representative Plaintiffs have demonstrated that, although variations in state law exist, they do not

---

9. Applying the teachings of *Tobacco II*, a California Court of Appeal, upon vacating and reconsidering its decision in *Pfizer*, 45 Cal.Rptr.3d 840, 844 (Cal.App.Ct.2006), for example, held that "the class certified by the trial court, i.e., all purchasers of Listerine in California during a six-month period, is grossly over broad because many class members, if not most, were never exposed to the alleged misrepresentations and are not entitled to restitutionary disgorgement." *Pfizer Inc. v. Superior Court*, 182 Cal.App.4th 622, 105 Cal.Rptr.3d 795, 802 (2010). This is in accord with Massachusetts consumer protection law. *See Kwaak v. Pfizer, Inc.*, 71 Mass.App.Ct. 293, 881 N.E.2d 812, 818 (2008) (precluding

certification of class that extended to "everyone who purchased Listerine products during the advertising campaign, regardless whether a purchaser was exposed to the campaign"). The California Court of Appeal posited that the majority of class members purchased Listerine during the relevant period because they were "brand-loyal customers" or for other reasons unrelated to the contentious advertisements. *Pfizer Inc. v. Superior Court*, 105 Cal.Rptr.3d at 798, 803. Here, the allegations are that all the class members were exposed to and relied upon the allegedly misleading representations by Gillette regarding the M3P razor system.

overcome the common factual and legal issues shared by the potential class members. The only purported distinctions actually argued by an objector—those presented by California consumer protection law—are, to the extent they are significant at all, differences of degree, not of kind, and are not substantial and clear-cut enough to require a subclass.

■ As is apparent from the text of this Memorandum, I have focused on consumer protection law as dispositive in this litigation. The various common law and commercial code counts alleged here do evidence significant differences among jurisdictions. Indeed, consumer protection statutes were developed principally to ease restrictions on consumer claims that were perceived to be embedded in common law and commercial law causes of action consumers might have otherwise deployed. And among consumer protection statutory schemes, the Massachusetts law under Chapter 93A appears to be in practice as generous as any available to class members in this litigation.

### 3. Necessity for Subclasses

■ Although differences obviously exist between and among the various causes of action recognized in the jurisdictions from which the class members here are drawn, I do not find these differences rise, as a legal matter, to a level that would require any settlement subclasses in this case. Objecting Plaintiff Corrales makes two additional arguments beyond the legal differences among causes of action for affording California consumers more favorable treatment: first, that California consumers paid more for their M3P razors; and second, that differences between California law and that of other jurisdictions underscore conflicts of interest which require separate treatment.

As to cost differentials, Corrales presents no reliable evidence in support of his factual contention on pricing, so this factor has no bearing on my analysis. I also observe that any class member who can provide a receipt showing that a M3Power razor being returned was purchased for more than the stipulated refund amount, that class member

"shall receive a check . . . for the actual price paid."

■ Regarding conflicts of interest, California consumer protections do not introduce significant difficulties for a nationwide (indeed international) class. All plaintiffs have the motivation to establish the same factual and legal findings and conclusions regarding Gillette's conduct. No meaningful allocation dilemmas are presented by the range of remedies available once those findings and conclusions are made. California plaintiffs have available remedies under California law similar to those available to the rest of the potential class under the laws of the several jurisdictions and precisely the same remedies as all class members under Massachusetts consumer protection law.

The Ninth Circuit decision in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, is illustrative. There, one objector to the class sought to exclude himself and all Georgia residents from the class action so that they could pursue separate legal recourse in Georgia state court. *Id.* at 1019. The court denied the request, finding that "the prospects for irreparable conflict of interest are minimal in this case because of the relatively small differences in damages and potential remedies." *Id.* at 1021. Even if some state law remedies varied, these variations did not create a "structural conflict of interest," and did not "warrant the creation of subclasses." *Id.* California consumer protection laws present differences that are, in the context of this case, both minimal and speculative.

Ironically, given the contrary arguments by plaintiff Corrales in this case, California courts occasionally have been asked by litigants in other cases not to certify nationwide fraud-based class action claims because California law was less favorable than the law of another state. In one such case, *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 17 (N.D.Cal.1986), objectors argued that pendent common law claims for fraud and negligent misrepresentation should not go forward as a class action based on California law, because it would be unfair under the reasoning of *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), to apply potentially less

favorable California law to non-California class members. In agreeing to certify the nationwide class, the *Pizza Time* court found that "[t]he relevant laws in all states are far more similar to each other than they are different,"[10] 112 F.R.D. at 21, and considered the nature of the underlying action in concluding that it was "apparent that each jurisdiction would rather have the injuries of its citizens litigated and compensated under another state's law than not litigated or compensated at all." *Id.* at 20. Particularly given the current state of California consumer protection law, Corrales has failed to demonstrate that California plaintiffs have materially stronger claims than other potential members of the class or otherwise are in conflict with other class members.

After comparing the California consumer protection law to Mass. Gen. Laws ch. 93A, which provides a cause of action common to all class members, and considering the other causes of action asserted by the class members, I find the relevant law applicable to all members in this case sufficiently similar such that a California subclass is unnecessary and I decline to authorize one. Especially given the commonality of the Chapter 93A claim for all class members, there are no particular advantages or disadvantages applicable to class members in any of the several jurisdictions and consequently no potential for conflicts of interest.[11] I have not received any objections, other than those of Corrales, which I do not find compelling. If objectors from other states emerge after notice is made, their concerns will be addressed at the Final Fairness Hearing.

10. The similarity between state consumer protection laws was noted by the California Court of Appeals in a case relied upon by Corrales:

> [e]ven though there may be differences in consumer protection laws from state to state, this is not necessarily fatal to a finding that there is a predominance of common issues among a nationwide class. As the Ninth Circuit has observed, *state consumer protection laws are relatively homogeneous:* "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims" and do not preclude certification of a nationwide settlement class.

*Wershba v. Apple Computer, Inc.,* 91 Cal.App.4th 224, 110 Cal.Rptr.2d 145, 161 (2001) (quoting

## IV. STANDARDS FOR CLASS ACTION SETTLEMENT APPROVAL

■ Federal Rule of Civil Procedure 23(e) requires judicial approval of all class action settlements. Before approving a class action settlement, I must find that it is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). When asked to review a class action settlement preliminarily, I examine the proposed settlement for obvious deficiencies before determining whether it is in the range of fair, reasonable, and adequate. *See, e.g.,* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632. The Advisory Notes to the 2003 Amendments to Rule 23 caution that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." FED. R. CIV. P. 23 advisory committee's note (2003). Ultimately, the more fully informed examination required for final approval will occur in connection with the Final Fairness Hearing, where arguments for and against the proposed settlement will be presented after notice and an opportunity to consider any response provided by the potential class members.

It is inherently difficult to determine the fairness and adequacy of a proposed settlement in the preliminary review context where the parties have advanced a settlement in lieu of litigation. Courts and commentators, nevertheless, have developed a presumption that the settlement is within the range of reasonableness when certain procedural guidelines have been followed. *See,*

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022–23 (9th Cir.1998)) (emphasis added).

11. The inclusion of Canadian class members is somewhat unusual, but I do not find that it presents potential conflicts within the class. While the judgment entered by this Court will not be enforceable in Canadian courts under the Full Faith and Credit Clause of the United States Constitution, the Supreme Court of Canada has made clear that a final judgment of this Court would receive essentially the same recognition in Canadian courts as it would in the courts of the United States. *See generally Beals v. Saldanha,* [2003] 3 S.C.R. 416 (Can.). Consequently, the Canadian plaintiffs here—as well as Gillette— will receive in this Court the same benefit from a final judgment as will United States plaintiffs.

*e.g., City P'ship Co. v. Atl. Acquisition Ltd. P'ship,* 100 F.3d 1041, 1043 (1st Cir.1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement."). These guidelines include whether: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Lupron Mktg. and Sales Prac. Litig.,* 345 F.Supp.2d 135, 137 (D.Mass.2004) (quoting *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995)).

█ I am satisfied that the negotiations in this case occurred at arm's length, and that the revised proposed settlement is more favorable to the potential class members than was Gillette's original response to pre-suit demand letters under state consumer protection statutes. Gillette originally offered to provide a $12 refund, or the actual amount paid if documented to be higher, to any consumer who purchased an M3P razor on or before July 1, 2005 and wished to return the razor. Postage was to be reimbursed based on the actual postage cost, and participating consumers would receive a coupon for $1 off a future purchase. The offer was limited to two razors per household, and there was no minimum floor on recovery.[12]

The revised and then amended Settlement Agreement has improved on the original offer in several ways. First, it establishes a minimum Settlement Fund of $7.5 million, and provides for notice with 80 percent reach to inform consumers of their rights as class members. Second, the Settlement Class Period was extended from July 1, 2005 to either September 30 or October 31, 2005, depending on the class member's country of residence. Third, the refund amount was increased from $12 to $13, and the reimbursement for shipping and handling was increased from the actual cost of postage, which necessarily omitted any handling costs, to $2. Fourth,

consumers are no longer required to return the M3P razor to obtain a benefit. Fifth, the Gillette shaving product available for rebate includes, as a result of the Amended Settlement Agreement, the newest offering in the Gillette product line. Sixth, the number of permitted claims per household was increased from two to three. Seventh, assuming money is left over from the Settlement Fund after the Initial Claim Period, members of the class will receive free Settlement Razors, along with coupons valued at $4.

The Objecting Plaintiff Corrales has not offered evidence that the negotiations were not at arm's length or were collusive in any way, and I see no reason to find otherwise. I appointed Co–Lead and Liaison counsel on the basis of their experience in similar matters, and, despite sniping by other counsel who were unsuccessful in their own efforts to become Lead or Liaison counsel, I have been provided no reason to question their competence or integrity in negotiating the proposed Settlement Agreement.

I am also satisfied that sufficient discovery has been undertaken to provide the parties with adequate information about their respective litigation positions. Gillette produced over 100,000 pages of documents from the District of Connecticut litigation against Schick, allowing the parties to acquire enough information rapidly to make serious settlement negotiations feasible. Gillette also produced pertinent financial information as part of confirmatory discovery, and Co–Lead counsel deposed a Gillette representative who was familiar with the relevant financial information. Having reviewed this information, I find it is sufficient to make an informed preliminary review of the fairness of the proposed settlement. Finally, the only practical way to ascertain the overall level of objection to the proposed settlement is for notice to go forward, and to see how many potential class members choose to opt out of the settlement class or object to its terms at the Final Fairness Hearing.

12. Corrales argues that the original offer contained no ceiling either, but all parties recognize that consumer redemption rates in cases such as this are likely to be low, so it is highly unlikely that the request for refunds under the original offer would come close to the $7.5 million allocated to the proposed settlement.

I do impose one additional requirement upon the Representative Plaintiffs as they proceed with the notice of the class action. In the notice to class members on the website created for this proposed settlement, the "Joint Submission by the Proponents of the Proposed Settlement Comparing the Relevant Laws of Applicable Jurisdiction for Settlement Class Certification" must be posted together with a copy of this Memorandum and Order alerting class members to the issues presented by the varying state law causes of action and remedies available to the class members. In this way, class members who may wish to learn more about those alternatives and consider their implications will have a foundation for doing so.

 Preliminary review is necessarily conditional. *See Lupron,* 345 F.Supp.2d at 138. "[A] preliminary approval of a settlement and a conditional class certification do[ ] not dispose of the litigation as significant hurdles must be met and cleared if a final settlement is to be approved." *Id.* (citing *Liles v. Del Campo,* 350 F.3d 742, 746 (8th Cir.2003)). If, after notice has been sent and the Final Fairness Hearing has been held, it appears that the settlement is not fair, adequate, and reasonable in whole or in part, I may require modifications either in the certification of the class or in the settlement provisions as a condition to approval of the settlement or I may reject settlement. On the present state of the record, I have found sufficient basis to permit notice of the proposed Settlement Agreement to go forward and to certify a class, without subclasses, solely for the purpose of settlement.

I believe this certification is consistent with the directions provided by the First Circuit, which has taken a practical and common sense approach toward class settlements. Recently, in *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 588 F.3d 24 (1st Cir.2009), the court observed that while Judge Saris, after detailed and rigorous analysis of the diverse legal regimes implicated, had originally excluded nine states from a nationwide *litigation class,* "since their consumer-protection statutes differed," she thereafter expanded the *settlement class* to reincorporate them.

*Id.* at 40–41 (citing *In re Pharm. Industry Average Wholesale Price Litig.,* 230 F.R.D. 61, 83–85 (D.Mass.2005)). In affirming the settlement class order, the First Circuit explained that it was "perfectly clear why the district court expanded the settlement class ... [The defendant] bargained for 'total peace' to resolve all remaining claims against it." *Id.* at 40–41.

More recently, the First Circuit has observed that "[a]lthough in class actions there is a preference for individually proved damages," nevertheless, "it is well accepted that in some cases an approximation of damages or a uniform figure for the class is the best that can be done." *Brown v. Colegio de Abogados de Puerto Rico,* 613 F.3d 44, 53 (1st Cir.2010). After extended reflection, I am satisfied on the basis of the record before me, and subject to reconsideration or refinement in connection with the Final Fairness Hearing, that the proposed settlement represents an acceptable resolution of this dispute.

## V. CONCLUSION

For the reasons stated more fully above, I have GRANTED class certification for a single Settlement Class; further, I have AUTHORIZED Notice as outlined in ¶ 3.2 of the proposed Settlement Agreement. The Final Fairness Hearing will be held on March 25, 2011 at 2:00 p.m. in Courtroom 1. In order to assist class members in making an informed judgment whether to lodge any objections to final approval of the settlement, the "Joint Submission by the Proponents of the Proposed Settlement Comparing the Relevant Laws of the Applicable Jurisdiction for Settlement Class Certification" and the within "Memorandum and Order" shall be posted on the website created under the July 30, 2010 Order Authorizing Notice of the Proposed Settlement.